THIRD DIVISION

September 11, 2002

No. 1-99-4193

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the 

) Circuit Court of 

Plaintiff-Appellee, ) Cook County.

)

v. )               

)

EVAN GRIFFITH, ) Honorable

) John J. Moran, Jr.,

Defendant-Appellant. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

On May 11, 1985, sixteen-year-old Evan Griffith, the defendant, used a hammer, then scissors, then a knife, and then a bigger knife to kill Leroi Shanks.  After killing Shanks, Griffith took about $124 from Shanks's wallet and ran away.  Eleven days later, on May 22, 1985, Griffith was arrested in Milwaukee, Wisconsin, and extradited to Chicago, Illinois, for trial.

More than 14 years later, Griffith went to trial, charged with intentional or knowing first degree murder, felony murder, and armed robbery.  On June 17, 1999, a jury found Griffith guilty of felony murder and armed robbery.  The trial court then sentenced him to life in prison without the possibility of parole.

On appeal, Griffith raises numerous contentions relating to his statements, jury instructions, and the prosecution's conduct. 

We affirm.

FACTS

A fairly detailed account of the facts is required for an understanding of why we decide the case as we do.

At the trial, the State offered the testimony of three witnesses -- Detective James Gildea, Detective Paul Parizanski, and Assistant State's Attorney Richard Sikes.  Griffith gave detailed statements to each of them.  Their accounts of what Griffith said he did to Shanks on May 11, 1985, were nearly identical:

Griffith knew Shanks for about two years.  He met him in 1983 when Griffith's family lived in an apartment building at 840 Belle Plaine in Chicago.  Shanks also lived in that building.  At the end of 1984, Griffith’s family moved to 6255 Oakley in Chicago, and shortly after that to Pennsylvania.

After being in Pennsylvania, Griffith ran away from home.  He returned to Chicago in February 1985.  When he got to Chicago, he "went straight to Leroi's [apartment]."  He lived there on and off until May 11, 1985.  

Griffith said Shanks was a homosexual and that the price of staying in the apartment was allowing Shanks to perform sexual acts on him.  But on May 11, 1985, said Griffith, there was a struggle when Shanks made new sexual demands.  Griffith said "no" a couple of times.  Shanks got mad.  Shanks tried to use force.  Griffith resisted.

After struggling for some time with Griffith, Shanks "just got [more] mad and started cussing me out."  He told Griffith he was ungrateful "and stuff like that."  Shanks told Griffith to leave the apartment by the time Shanks returned.  Then Shanks left.  It was about noon.

Griffith became angry.  After Shanks left, Griffith started drinking a bottle of wine that Shanks kept on his dresser.  He just sat there for a while, "thinking and stuff."  After thinking Shanks had hurt him "this way," Griffith decided he was going to hurt Shanks in another way.  He was going to "rip [Shanks] off."

Griffith knew Shanks had been collecting money from the tenants of his apartment building.  He believed Shanks had between 12 and 14 hundred dollars and knew Shanks kept the money in a safe in his closet.  Griffith went into the closet and took out the safe.  

Griffith then got a tool box.  He emptied the tool box on the floor and picked up a hammer and chisel.  He used the hammer and chisel to put a hole in the top of the safe.  After about an hour and a half, and drinking almost a whole bottle of wine, he was able to pry open the safe.  But there was no money; the safe was empty.

After finding nothing in the safe, Griffith decided to leave the apartment.  As he was getting ready to leave, Shanks came home.  Griffith got worried.  He thought that if Shanks saw the safe open he would call the police, or worse, try to hurt Griffith in some way.  So he picked up the hammer he used to break open the safe and hit Shanks on the head with it.

Shanks fell down, but he got back up in a couple of seconds.  Griffith again hit him with the hammer.  He was trying to "knock him out."  But Shanks "didn't want to knock out."  Griffith hit him with the hammer a couple of more times, about four or five times total.

Shanks picked up a chair and tried to defend himself, but Griffith took the chair away from him.  Shanks continued to try to defend himself.  At some point the hammer broke, so Griffith grabbed a pair of scissors.  He used the scissors to stab Shanks, but the scissors "didn't go in."

Griffith then retrieved a red-handled kitchen knife.  Griffith "tried to use that, too, but the handle broke off, and it didn't go in either."  Its blade was long and thin, and it bent instead of penetrating Shanks's body.

Griffith then retrieved a "bigger" kitchen knife that had a heavier blade.  He used this knife to stab Shanks in the back and neck.  Shanks "fell back down again and that was it."  When Shanks fell down, he was breathing hard, and his eyes were open.

Once Shanks was down, Griffith went through Shanks's pockets looking for money.  He found Shanks's wallet.  Griffith took the wallet from his back pocket, opened it, and took $124 out of it. 

Griffith then gathered up his belongings, took Shanks's prescription medication, and left the apartment.  At some point when he was leaving the apartment, Shanks said to him, "You're going to jail for this."  Griffith then fled from the apartment.

Griffith came back to Shanks's apartment building two days later, on May 13, 1985, and went to the garage where Shanks's car was parked.  He tried to break into Shanks's car because he thought that Shanks's money might be in it.  He could not, however, get into the car.

The State offered the following testimony to describe what Griffith did after he killed Shanks:

Richard Kasparian, also known as Vrej Abdelahad and nicknamed Virgil, testified that on May 11, 1985, his dad owned a three-flat apartment building located at 6225 North Claremont.  According to Kasparian, Griffith came to him on the evening of May 11 and told him he had killed the man he had been living with.  Griffith asked Kasparian if he could stay for a couple of days in the basement of his father's building.  

Before Kasparian replied to Griffith's request, he asked Griffith why he killed the man.  Griffith said, "For the money."  Griffith told Kasparian he took $123 from the man he killed.  He then showed Kasparian the money, and told him he killed the man by the closet in his apartment on Belle Plaine.  He said he used a hammer to kill him. 

 Kasparian allowed Griffith to stay in the basement for a couple of days.  Kasparian did not know when Griffith left -- "one day he was just gone."  Later, when police came by, Kasparian told them all he knew about Griffith. 

Detective Richard L. Mariner of the Area 6 Violent Crimes Unit of the Chicago Police Department, testified that at 2:40 p.m., on May 14, 1985, he and his partner Detective Daniel Sterling drove to 820 West Belle Plaine to investigate a murder.  

820 West Belle Plaine was a high-rise apartment complex.  It was 24 stories high and had 271 apartments.  The detectives went to apartment 809.

The detectives walked through the door of apartment 809 and immediately entered a long hallway, about 12 feet long.  At the entrance of the hallway the detectives saw a cardboard box.  In the box was an eight-inch butcher knife.  The knife had blood on it.

While walking down the hallway, passing the kitchen that was off to the left, the detectives smelled a very strong odor.  The odor did not emanate from the kitchen.  It came from within the apartment. 

The hallway opened up into the apartment's living room.  The rectangular living room was about 25 feet by 18 feet.  It was in complete disarray: furniture was knocked over and things were strewn about.  

The detectives took particular notice of a chair in the living room.  The chair was lying on its side.  It had blood on both its front legs and the front portion of the seat cushion.  There was no blood anywhere else in the living room.

The detectives continued walking through the apartment.  Off to the left and eastern-most portion of the living room was another hallway.  The detectives looked down that hallway and saw the body of Leroi Shanks.  His body was face down.  The upper portion of his body was in the hallway and the lower portion extended back into the living room. 

The detectives saw "a lot of blood."  There was blood splattered on the walls of the hallway, on a bathroom door, on a closet door, and on the hallway ceiling.  Shanks's body was in a pool of blood.  He was wearing a white T-shirt that was blood-soaked and brown pants.  Shanks had a shoe on only one foot.  The other foot was bare.  

Shanks's body was "in a state of decomposition" and was the source of the strong odor.  It had several stab and/or puncture wounds, which were later determined to be the cause of his death.  Near Shanks's body, the detectives found a bloody nine-inch knife "minus the handle," the handle of a hammer, the bloodied head of that hammer, and a bloody pair of scissors.

Past Shanks's body was a linen closet.  The linen closet door was bloody and open.  A safe had been removed from the linen closet and placed on the floor, about two feet into the hallway.  The safe had been broken into.  The top of the safe had been punctured, and the hinges of the safe door had been pried so that the door hung open.  On the floor near the safe were several different types of tools.  The safe was empty.

After conducting further investigation, the detectives obtained an arrest warrant for Griffith, who, to the detectives' knowledge, was sixteen years old at the time.

Angel Mazariegos testified that on May 16, 1985, five days after Shanks was killed, he was "hanging out" with Griffith when police officers approached.  Before the officers could approach, Griffith told Mazariegos that if the police asked for him, Mazariegos should tell them he did not know Griffith.  

When the police approached, they asked Mazariegos and Griffith if they knew an Evan Griffith, because they were looking for him.  Both Mazariegos and Griffith replied they did not know an Evan Griffith.  After the police checked their identifications -- Griffith used a false ID -- and left, Griffith admitted the police were looking for him because "he had committed a murder, and he killed his roommate over money."  Griffith later added that he needed to get out of town.  He specifically mentioned Milwaukee, Wisconsin.

Mazariegos felt "surprised" and "overwhelmed" by Griffith's admissions.  He left Griffith at a building on North Oakley.  He later returned with the police, but Griffith was gone.  He then went with the police officers to the Area 6 police station and gave a statement.

Lopez Lminggio testified that sometime after May 16, 1985, Griffith came to his home in Lake Geneva, Wisconsin.  Lminggio was like "a big brother" to Griffith.  He had known him for a few months.

Griffith told Lminggio he needed to speak to him.  So Lminggio put his wife and kids in the living room and took Griffith into his bedroom.  There, Griffith told him he had killed Leroi Shanks with a hammer and knives.  When Lminggio asked him why, Griffith replied, "Because of some money, some money."  Although Lminggio first agreed to hide Griffith, he "got to thinking" and turned Griffith over to the Milwaukee police.  

Detective Thomas Boehlke of the Milwaukee Police Department testified that on May 22, 1985, he and his partner Detective Mike Carlson, Detectives Elmore and Gildea of the Chicago Police Department, Officer Hanson of the Walworth County Sheriff's Department, and Lopez Lminggio formulated a plan to arrest Griffith.  That same day the plan was carried out, and Griffith was arrested.  After being arrested, Griffith was taken to the Milwaukee police station.

At the Milwaukee police station Detective Gildea advised Griffith of his constitutional rights.  While Gildea was advising Griffith of his constitutional rights, Detective Boehlke called Griffith's mother, Myrna Griffith.  She was in Yeadon, Pennsylvania.  Detective Boehlke told Griffith's mother "where [he] was, and why."  She made no reply or requests.  Detective Boehlke then told Griffith he had contacted his mother.  Griffith also made no reply or requests.

Detective James Gildea of the Area 6 Violent Crimes Unit of the Chicago Police Department, testified that he and his partner, Detective Elmore, were assigned to investigate the murder of Leroi Shanks.  On May 22, 1985, he and his partner were called to the Milwaukee police station to assist in the arrest of Griffith. 

After Griffith was arrested by Milwaukee police, he was brought to the Milwaukee police station.  At the station, Detectives Gildea and Elmore spoke to Griffith.  But first Detective Gildea gave Griffith 
Miranda
 warnings.  According to Gildea, Griffith said he understood his rights and said he wanted to talk to him.  They spoke for about 15 minutes. 

After Griffith told Detective Gildea how and why he killed Shanks, Detective Gildea arrested him for the first degree murder of Leroi Shanks.  The detective left Griffith to be processed in Milwaukee.  He and his partner returned to Chicago.

Detective Paul Parizanski of the Area 6 Violent Crimes Unit of the Chicago Police Department, testified that on June 5, 1985, he and Detective Bittenbinder were assigned to transport Griffith from Milwaukee to Chicago.  Griffith had waived extradition and was ready to be transported.

At about 10:30 a.m., on June 5, 1985, Milwaukee police turned Griffith over to the detectives.  After Griffith was taken into custody by the detectives, the detectives placed him in the back of their unmarked squad car and began the drive back to Chicago.

As the detectives and Griffith were driving back to Chicago, Griffith started talking.  Detective Bittenbinder said, "Wait, wait, just a minute before you say anything to us."  He then took out a card and said, "Before you saying anything, I have to read you what is commonly referred to as your 
Miranda
 warnings."  

"I have already heard that already when I got arrested in Milwaukee," replied Griffith.  

Detective Bittenbinder said, "It doesn't matter, I'm going to tell them to you all over again, just so we're straight."  Detective Bittenbinder then read Griffith his 
Miranda
 warnings from the card.

After hearing the 
Miranda
 warnings, Griffith began a narrative about how he killed Shanks.  The drive from Milwaukee to Chicago took a little more than an hour and Griffith spent most of the ride talking about what happened.  "He just kept talking."  

Before taking Griffith to Area 6, the detectives bought themselves and Griffith some food from Burger King.  When they arrived at Area 6, Detective Parizanski immediately started typing a report of Griffith's narrative, and Detective Bittenbinder took Griffith to a youth officer.

Richard Sikes testified that on June 5, 1985, he worked as an Assistant State's Attorney for the Cook County State's Attorney's Office.  He was assigned to the Felony Review Unit.  Between 2:00 and 2:15 p.m., Sikes was called to Area 6 to interview Griffith.

When Sikes arrived at Area 6, he met with Detective Parizanski.  Detective Parizanski gave Sikes a brief outline of what had happened before Griffith's arrest.  After Sikes and Detective Parizanski reviewed police reports together, Sikes went into a conference room at Area 6 and spoke with Griffith.  Detective Parizanski and a youth officer, Officer DiGiulio, were present for the conversation.

Before speaking to Griffith, Sikes told him he could be tried as an adult.  He then advised him of his 
Miranda
 rights.  Then he asked Griffith, "Having told you those rights and understanding them, do you wish to talk to me about what you know about the death of Leroi Shanks?"  Griffith said he did.  He agreed to make a court-reported statement.

Before making the court-reported statement, Sikes talked to Griffith alone.  Sikes asked him if he had been treated well.  He specifically asked him if he had been provided food and cigarettes.  Griffith said he had.  Sikes again asked him if he, in general, had been adequately treated.  Griffith repeated that he had.

Just before 5:00 p.m. on June 5, 1985, a court reporter arrived at the conference room at Area 6 and took Griffith's statement.  Sikes, Detective Sterling, and youth officer Stratton also were present.  Before Griffith started speaking, Sikes again gave him 
Miranda
 warnings.  Griffith again said he understood his rights and wanted to make a statement.  Griffith then told Sikes how and why he killed Shanks.  His description of what he did after he killed Shanks was consistent with the testimony of Richard Kasparian, Angel Mazariegos, and Lopez Lminggio.  

Griffith's testimony at trial was substantially similar to the statements he made to Detective James Gildea, Detective Paul Parizanski, and Assistant State's Attorney Richard Sikes, with a few exceptions:  

First, Griffith said he was born in Belize.  He lived there with his grandparents until he was eight years old.  At about the age of eight, he moved to the United States to live with his parents.  Between the ages of eight and sixteen, he had suffered mental and physical abuse from his father and sexual abuse from his brother.  This abuse was what caused him to react to Shanks the way he did.  Specifically, he said that when Shanks walked into his apartment and saw his safe had been broken into, Shanks looked at him with angry, blank eyes.  "It looked *** like the way my father's eyes used to look," said Griffith.  He added that Shanks looked and sounded like his father.  He thought Shanks would molest, rape, or kill him.

Second, Griffith testified that Shanks grabbed a chair and raised it to shoulder height and threatened him with it before he grabbed the hammer.  He said that when Shanks threatened him with the chair, he got scared, numbed, and then began to shake and sweat.  He said he had the "[s]ame kind of feelings" he had before his father beat him and before his brother molested him.  "[S]ome emotions overpowered" him, and he picked up a hammer and hit Shanks with it.  

After hitting Shanks with the hammer one or two times, his memory fails.  That is, he had a "blackout."  The next thing he remembers was a sharp pain in his hand, on his finger.  He looked down and was surprised to see Shanks on the floor in a lot of blood.  He then realized he had cut his finger on a knife he held in his hand.  He could not remember exactly how and where he stabbed Shanks.

Third, Griffith testified that taking money from Shanks's wallet was an afterthought.  That is, after realizing he had hurt Shanks, he gathered his things and was leaving the apartment when he noticed Shanks's wallet "hanging" out of his back pocket.  He removed the wallet from Shanks's back pocket and took out $124.  He then dropped the wallet and left the apartment.

Finally, although Griffith said he cooperated with Detective Gildea and "told him things that he remembered happening," he said Detective Gildea asked him leading questions that filled gaps in his memory.  He answered yes to Detective Gildea's leading questions because he thought it was easier to answer yes than explain he could not remember certain things.  In addition, although he said he talked to the other detective and to Sikes -- saying they all treated him "very nicely" -- he thought if he cooperated with Sikes and told him the same story he had told the detectives he would not be charged as an adult.

On cross-examination, Griffith admitted that after he took Shanks's money out of his wallet, Shanks told Griffith he was going to jail for what he had done.  Griffith also admitted that he went back to the apartment building after killing Shanks, but said he only pretended to look for Shanks's money -- in a random car because Shanks did not own a car -- at the prompting of some friends.  

In addition, Griffith said he felt justified in killing Shanks, because he feared for his life, but then added that he felt "surprise" and "remorse" when he "came to."  He admitted telling Kasparian and Mazariegos he had killed Shanks for the money.  He also admitted that when he killed Shanks, he knew Shanks was not his father or his brother.  He said he was afraid of getting caught because he knew what he did was wrong.

During Griffith's case-in-chief he also offered five witnesses who corroborated his testimony that his father mentally and physically abused him: Yeadon, Pennsylvania police officer Larry Richards; his mother, Myrna Griffith; his sister, Alice Roberts; his sister's husband, Halvert Roberts; and another of his sisters, Gilda Patnett.  These witnesses never actually saw Griffith's father beat him and never reported the beatings to anyone.

Bernard Griffith, Jr., Griffith's brother, testified he sexually abused Griffith for about two years when he was fourteen and Griffith was nine.  He was confronted, however, with various inconsistencies between his testimony, his sworn affidavit, and Griffith's testimony.

Dr. Robert E. Chapman, an expert in forensic psychiatry, testified on behalf of Griffith.  He evaluated Griffith in 1992 and prepared a mitigation report in connection with another case.  In 1998, he again evaluated Griffith, but made no significant deletion or addition to his 1992 report.  Dr. Chapman said Griffith had several chronic disorders, most of which had no effect on his conduct at the time he killed Shanks.  

Notwithstanding, Dr. Chapman said Griffith was suffering from post-traumatic stress disorder (PTSD) on May 11, 1985.  Griffith's history of physical and sexual abuse caused him to exhibit a "fight or flight" reaction to stress.  He opined that because of Griffith's PTSD he perceived more of a threat on the day of the killing than an ordinary individual would have perceived. 

Dr. Chapman said Griffith also suffered from acute stress disorder (ASD) on the day he killed Shanks.  ASD is similar to PTSD, but is experienced in a rapid onset.  It arises during a particularly stressful situation and is short and severe.  The symptoms of ASD include varying degrees of amnesia and "dissociative reaction" (where behavior can become automatic and repetitive).  He opined that Griffith's ASD did not explain his initial actions toward Shanks -- for example, wanting to "rip off" Shanks --, but the "excessive" and overly-aggressive nature of his attack and his claim of memory loss "fit[] the pattern" of ASD.

On cross-examination Dr. Chapman admitted his 1992 report was a mitigation report.  That is, he was hired to say something favorable about Griffith.  He also admitted that in 1992, he did not diagnose Griffith with PTSD, ASD, or anything else, and explained that his diagnosis of PTSD in 1998 was based primarily on Griffith's self-reported symptoms.

In rebuttal, the State offered the testimony of Dr. Reifman, an expert in forensic psychiatry.  He was the former Director of the Cook County Forensic Institute (Institute).  Dr. Reifman evaluated Griffith in 1986, but had Dr. Rabin, a psychologist at the Institute, examine him first.  Dr. Reifman reviewed Dr. Rabin's report and then conducted his own interview of Griffith.  He also reviewed other materials, like the police reports.

Dr. Reifman diagnosed Griffith with passive aggressive personality (PAP).  PAP is a personality disorder, not an anxiety or psychotic disorder.  He found Griffith did not have any major psychiatric illness.  That is, Griffith did not have hallucinations or delusions, was not disorientated, withdrawn, agitated, or confused, and did not exhibit any bizarre behavior. 

Dr. Reifman also found Griffith was not hyperactive or suicidal, and he had no flight ideas, memory defects, or memory loss.  In short, he found Griffith had lacked any major psychiatric symptoms and did not suffer from PTSD.

On cross-examination, Dr. Reifman admitted that it was possible Griffith had PTSD in 1985 and 1986, but not probable.

The State then offered the testimony of Dr. Albert Stipes, an expert in forensic psychiatry.  He was the Assistant Director at the Institute.  Although Dr. Stipes did not interview Griffith in 1985, he did in 1999.  In addition, Dr. Stipes reviewed the police reports and the reports of other mental health professionals who examined Griffith, including the reports of Dr. Reifman and Dr. Rabin.  

Dr. Stipes opined that under the current DSM IV standards (American Psychiatric Association, 
Diagnostic and Statistical Manual of Mental Disorders
 (4th ed. 1994)), Griffith was suffering from PTSD in 1985.  He said, however, that his diagnosis was based solely on Griffith's self-reporting of symptoms, symptoms Griffith did not report in 1986.  

Notwithstanding, Dr. Stipes said that even if Griffith did have PTSD in 1985, that disorder "would not have anything to do with [Griffith's] contact with reality."  He explained that PTSD "is not a psychotic diagnosis.  A person does not really lose contact with reality.  They are still aware of what's real and what's not real."  

Dr. Stipes then said that he would not diagnose Griffith with ASD.  He said ASD is merely an anxiety disorder.  And even if Griffith had it, said Dr. Stipes, it was a possible explanation for why Griffith stabbed Shanks so many times -- ASD is commonly associated with excessive, repetitive behaviors.  Dr. Stipes found, however, that Griffith had "regular old rage and anger," which he believes explains the nature of Griffith's attack.

In short, Dr. Stipes believed Griffith knew what he was doing when he killed Shanks.  That is, Griffith knew who he was and knew Shanks was not his father or his brother.  Dr. Stipes said that even if Griffith did suffer from total amnesia, it would not mean he did not know what he was doing when he attacked and killed Shanks.  Memory and cognition are two different things.

In sur-rebuttal, Griffith called Dr. Chapman.  He refused to change his diagnosis in light of the testimony of Dr. Reifman or Dr. Stipes.

After hearing closing arguments and being instructed by the trial judge, the jury found Griffith guilty of armed robbery and felony murder.  Following the denial of a post-trial motion, the trial court sentenced Griffith to life imprisonment without parole for felony murder and merged the armed robbery conviction.

This appeal followed.

DECISION

Griffith raises numerous issues on appeal: (1) the trial court erred in failing to suppress Griffith's confessions; (2) the trial court erred in granting numerous jury instructions proposed by the State and denying numerous instructions proposed by Griffith; (3) Griffith was denied due process and a fair trial because the State engaged in numerous instances of misconduct; (4) the trial court committed error warranting reversal when it (a) allowed evidence of a 1990 crime into evidence and allowed the State to misuse the evidence, (b) did not grant Griffith's motion for mistrial for a reference to the Capital Resource Center, (c) did not allow one of Griffith's experts to testify and limited the testimony of other defense witnesses, and (d) refused to ask Griffith's proposed questions regarding psychiatrists and psychologists to the jury during 
voir
 
dire
; (5) the State failed to prove felony murder beyond a reasonable doubt and disprove voluntary manslaughter; and (6) the trial court erred in considering Griffith's prior conviction for murder in sentencing him to life in prison.

We do not address Griffith's issues in the same order he presents them.  Many of them relate entirely to the intentional or knowing first degree murder charge, never reached by the jury.  Our analysis of what occurred at this unusual trial is shaped by the overwhelming evidence that led the jury to convict Griffith of felony murder.

The Felony Murder Charge

To friends who helped conceal him, for at least a little while, Griffith said he killed Shanks "for the money," "over money," and "because of some money."  To police officers and an assistant state's attorney he consistently and repeatedly gave a grizzly account of killing Shanks.  His purpose: he was going to "rip  [Shanks] off."

Griffith moved to suppress his various statements to police and prosecutor, but the trial judge correctly denied the motion. Griffith agreed that he understood his 
Miranda
 rights.  He was treated well.  He never showed any reluctance about giving his several accounts of the killing and of taking Shanks's money.  His detention was lawful.  The police contacted Griffith's mother in Pennsylvania when he was arrested, but she showed no interest in being present for questioning, and Griffith displayed equal disinterest in having her there.  There is no evidence Griffith ever was coerced or threatened; nor was he promised anything for his various statements.  Although 16-years-old, Griffith had been on his own for some time and had some experience with the criminal justice system, having been arrested before for car theft.

The totality of circumstances in this case makes a stronger case for voluntariness than did the circumstances in 
In re G.O.
, 191 Ill. 2d 37, 727 N.E.2d 1003 (2000), a case affirming admissibility of a 13-year-old's confession.  Here, as in 
In re G.O.
, the fact that the youth officer who was present did nothing to assist Griffith during questioning does not weigh heavily in light of the substantial evidence of voluntariness.

While Griffith testified to having memory problems during police questioning, he raised that issue for the first time during trial, too late to be used for his suppression argument.  See 
People v. Brooks
, 187 Ill. 2d 91, 127-28, 718 N.E.2d 887 (1999).

Griffith contends there is another reason to suppress his statements: he was born in Belize and that means the police were required to inform him of his rights under the Vienna Convention, including his right to consular assistance.  The immediate problem facing Griffith is that he never told anyone he was from Belize and there is no evidence any police officer or assistant state's attorney knew it.  In addition, we have held suppression of statements is not an available remedy for violations of Article 36 of the Vienna Convention.  
People v.  Hernandez
, 319 Ill. App. 3d 520, 531, 745 N.E.2d 673 (2001);  
People v. Villagomez
, 313 Ill. App. 3d 799, 809-12, 730 N.E.2d 1173 (2000).

Not only did Griffith tell three friends, the arresting police officers, and the assistant state's attorney he killed  Shanks for the money, he made what amounts to a judicial  confession when he testified at trial.  That is, he broke open and rifled the safe before Shanks came home; he then beat and stabbed Shanks; and, when his blackout ended, with Shanks helpless on the floor, he took money from Shanks's wallet, which was "hanging" out of Shanks's back pocket.

Griffith contends taking the money was afterthought, that he was not in the process of robbing Shanks while striking and stabbing him.  That is, he claims robbery was not the motive for the killing.

The afterthought defense does not work.  Griffith was able to take the money because he had rendered Shanks helpless.  The jury did not have to find Griffith formed the criminal intent to commit armed robbery before committing the murder.  
People v.  Pitsonbarger
, 142 Ill. 2d 353, 372-73, 568 N.E.2d 783 (1990)  ("it is sufficient that the State proved the elements of the crime and the accompanying felonies were part of the same criminal episode").

Our supreme court has consistently rejected the afterthought defense.  For example,

" 'If, as a result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, without having formed the intention before the fight began, takes the money of the vanquished one, the offense committed is robbery.' "  
People v. Strickand
, 154 Ill. 2d 489, 524, 609 N.E.2d 1366 (1992) (quoting 
People v. Jordan
, 303 Ill. 316, 319, 135 N.E. 729 (1922)).

The court's most recent pronouncement on the afterthought defense to a felony murder closes the inquiry: "Even if the defendant's use of force preceded the actual taking of the property, the offense would still be armed robbery under 
Strickland
 and 
Jordan
."  
People v. Kidd
, 175 Ill. 2d 1, 43-44, 675 N.E.2d 910 (1996).

Clearly, Griffith's use of force and his theft of Shanks's money was the same criminal episode.  The test for reviewing the sufficiency of evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  
People v. Howery
, 178 Ill. 2d 1, 38, 687 N.E.2d 836 (1977).  To say the least, the State's evidence on the felony murder count was overwhelming.

Once the jury found the State had proved its felony murder charge, there was no lesser charge for the jury to consider.  A defendant cannot be found guilty of a mitigated second degree murder based on a charge of first degree felony murder.  
People v. Villarreal
, 198 Ill. 2d 209, 230, 761 N.E.2d 1175 (2001) (second degree murder based on unreasonable belief of justification could not mitigate felony murder); 
People v. Morgan
, 197 Ill. 2d 404, 758 N.E.2d 813 (2001) (provocation defense of second degree murder is not available to a charge of felony murder).  We believe the same reasoning applies to Griffith's failed attempt to obtain an involuntary manslaughter instruction as a lesser degree alternative to felony murder.  See 
People v. Ellis
, 93 Ill. App. 3d 981, 418 N.E.2d 88 (1981); 
People v. Weathers
, 18 Ill. App. 3d 338, 309 N.E.2d 795 (1974).  But see 
People v. Taylor
, 212 Ill. App. 3d 351, 570 N.E.2d 1180 (1991).  Even if such an instruction were possible, there was no evidence here that Griffith was acting recklessly when he killed Shanks.

The Felony Murder Instruction

Faced with a plethora of evidence concerning Griffith's  troubled history and his mental state in 1985, evidence relevant to the intentional or knowing first degree murder charge, the State moved to focus the jury's attention on the felony murder count.  It persuaded the trial court to instruct:    

"To sustain the charge of felony murder (Type A), the State must prove the following propositions:

First
: That the defendant performed the acts which caused the death of Leroi Shanks; and 

Second
: That when the defendant did so, he was committing the offense of armed robbery.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty of felony murder (Type A) 
and your deliberations should end
.  

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty of felony murder (Type A).  You should then go on with your deliberations to decide whether the defendant is guilty of murder (Type B), voluntary manslaughter, or not guilty of murder (Type B)."  (Emphasis added.)

Griffith contends the instruction was improper because it was non-IPI and he had tendered appropriate instructions based on IPI.  See Illinois Pattern Jury Instructions, Criminal (4th ed. 2000) (hereinafter IPI Criminal).  Griffith says non-IPI instructions are to be given only when the existing IPI instructions do not accurately state the law and cites 
People v. Wilkerson
, 87 Ill. 2d 151, 429 N.E.2d 526 (1981) and Supreme Court Rule 451(a).  According to Griffith, because the existing IPI instructions correctly stated the law, the trial court erred in granting the State's proposed instruction that tells the jury to end its deliberations if it finds the defendant guilty of felony murder.

He contends the instruction improperly highlights felony murder by placing it first as Type A.  According to Griffith, the IPI instruction describes first degree intentional or knowing murder as Type A and felony murder as Type B.  See IPI Criminal No. 27.05.  This modification, Griffith says, is harmful to him because it allowed the jury to consider felony murder first before considering self-defense or voluntary manslaughter.  

We do not agree that the trial court committed reversible error when it gave the non-IPI instruction. 

While Supreme Court Rule 451(a) requires a trial court to give an IPI instruction that correctly states the law, a "trial court has discretion to allow non-IPI instructions which cover subjects that it determines the jury should be instructed upon, and tendering such instructions is proper if they are accurate, simple, brief, impartial, nonargumentative statements of the law."  
People v. Ramey
, 151 Ill. 2d 498, 536, 603 N.E.2d 519 (1992) (citing 134 Ill. 2d R. 451(a)).

The Fifth District was faced with a similar, although not identical, instruction in 
People v. Walker
, 227 Ill. App. 3d 104, 590 N.E.2d 1018 (1992).  In that case the jury was instructed on first degree and second degree murder.  The instructions, based on pattern instructions, told the jury that if it concluded that the elements of first degree murder had been proven, it should then determine whether the offense should be reduced to second degree murder.  
Walker
, 227 Ill. App. 3d at 104.

During deliberations, the jury sent the trial court a request for an interpretation of these instructions.  The trial court drafted an instruction partly modeled on IPI Criminal No. 7.02A, which listed the elements for first degree murder, including felony murder.  The instruction went on to read that if the jury found the elements of first degree murder based on felony murder were satisfied, "then it is not necessary for you to consider the issue of second degree murder."  The defendant argued the instruction unduly emphasized the offense of first degree murder, "thereby giving the jury the impression it only had one option to consider to the exclusion of less serious alternatives including acquittal."

The court rejected defendant's argument:

"We believe the supplemental instruction given here accurately stated the law and, contrary to defendant's contention, did not overemphasize first-degree murder.  Rather, the court's instruction clearly delineated the choices available to the jury and alleviated confusion by informing the jurors 
they could not reach the issue of second-degree murder if they determined defendant was guilty of first-degree murder based on felony murder
.  The instruction further informed the jurors they could find the defendant not guilty if they determined the State had failed to prove any one of the elements beyond a reasonable doubt, or if they concluded the evidence established first-degree murder on a basis other than felony murder, they should consider the issue of second-degree murder." (Emphasis added.)  
Walker
, 227 Ill. App. 3d at 105.  

The court then concluded the trial court did not commit error in issuing the instruction.  
Walker
, 227 Ill. App. 3d at 105.

We agree with the Fifth District's reasoning.  The instruction in this case avoids any confusion by making clear to the jurors that, should they find the elements of felony murder proven, they could not consider whether the offense should be reduced to voluntary manslaughter.  As the court in 
Walker
 said, this instruction does not overemphasize felony murder because the instruction also tells the jury what to do if it finds felony murder was 
not
 proved.  

Griffith's contention that the label of Type A used for felony murder improperly highlighted felony murder above other offenses is not supported by IPI Criminal.  

The terms "Type A" and "Type B" are used to distinguish first degree intentional or knowing murder from felony murder.  The letters that are used have no legal significance and that is what judges should tell juries (IPI Criminal No. 7.01X), although this judge did not.

Here, the instructions referred to the felony murder as Type A and the knowing or intentional murder as Type B.  The IPI Criminal does it differently, referring to intentional or knowing murder as Type A and felony murder as Type B.  See Committee Note to IPI Criminal No. 7.01X and Sample Set of Instructions No. 27.05.  At the same time, the sample set of instructions that covers the felony murder/intentional or knowing murder situation first instructs the jury on the felony murder, Type B, then on the intentional or knowing murder, Type A, and presents the verdict forms in that same order -- felony murder first.  See IPI Criminal, Sample Set of Instructions No. 27.05, at 522-529.

The conclusion we draw from all of this is that it really does not matter which one comes first, Type A or Type B.  Nor does it matter which kind of murder gets which letter.  What matters is that the jury is properly instructed on the issues in the case.  We do not see how Griffith was injured when the trial court told the jury to consider the felony murder first.  If the jury had found Griffith not guilty of that charge, it would then move on to consider the intentional or knowing murder.  Having found Griffith guilty of the felony murder, there was no need to consider the intentional or knowing murder along with all the mental state baggage that had been attached to it.  We do not see how Griffith was harmed by the State's jury instruction. 

At the same time, we see no good reason why the trial court would depart from the IPI Criminal by telling the jury to stop its deliberations if it should find Griffith guilty of felony murder.  The command to stop deliberating on issues the jury has heard so much about could be confusing and should be avoided.  We note, too, the State takes a risk by urging this procedure.  Should a conviction on the felony murder be reversed on appeal for some reason, the State might be left without a murder charge.  But that is unnecessary speculation for some other day.

The bottom line is that the trial court correctly instructed the jury about the possible verdicts it might return.  The felony murder had to be treated as a separate and different charge from first degree intentional or knowing murder.  
Villarreal
, 198 Ill. 2d at 229.  That is because the voluntary manslaughter verdict possibility applied only to the intentional or knowing murder, not to the felony murder.  
Villarreal
, 198 Ill. 2d at 230.

Griffith contends the jury was deprived of the option of concluding that voluntary manslaughter and armed robbery were sufficient and appropriate punishment.  We do not agree.  In 
People v. McClellan
, 232 Ill. App. 3d 990, 600 N.E.2d 407 (1992), the case Griffith relies on, the jury convicted defendant of armed robbery and voluntary manslaughter, but found defendant not guilty of felony murder.  The court said that while the verdict was logically inconsistent, the jury was allowed to reach such a conclusion.  
McClellan
, 232 Ill. App. 3d at 1009.

The circumstances in this case are markedly different.  First, we are not reviewing a logically inconsistent verdict.  Instead, we are considering whether the trial court erred in giving the State's instruction.  Yet, Griffith stretches 
McClellan
 to support his argument that somehow the trial court is required to give a jury authority to disregard the law.  

On the contrary, while a jury has the power of nullification, a defendant does not have the right to argue or instruct a jury on nullification, nor does he have the right to have a jury ignore the law or undisputed evidence in a case.  
People v. Moore
, 171 Ill. 2d 74, 109-10, 662 N.E.2d 1215 (1996).  Griffith is not entitled to jury nullification or an instruction that encourages jury nullification simply because juries have ignored the law in other cases.  See 
Moore
, 171 Ill. 2d at 109-10. 

We find the trial court did not abuse its discretion under the circumstances of this case when it gave the State's felony murder instruction.  See 
People v. Kopczick
, 312 Ill. App. 3d 843, 851, 728 N.E.2d 107 (2000).  

Other Instructions Issues

Griffith raises other instructions issues that can be disposed of without extended discussion: 

(a)  Although it was error for the trial court to give the jury two instructions concerning Shanks's right of self-defense (see 
People v. Flores
, 269 Ill. App. 3d 196, 645 N.E.2d 1050 (1995)), no harm was done because they applied only to the intentional or knowing first degree murder charge, not to the felony murder;

(b) The State's self-defense instructions based on IPI Criminal Nos. 24-25.10 and 24-25.11 were supported by the evidence.  Besides, they related only to the intentional or knowing first degree murder charge;

(c)  There was no evidence to support the initial use of force instruction (Criminal IPI No. 24-25.09X) offered by the defense.  In addition, it did not relate to the felony murder charge;

(d)  There was no need to give the defense instruction that it was for the jury to determine whether Griffith made the statements offered against him.  Griffith admitted making them.  The dispute was about form;

(e)  Griffith waived his claim that the State's instructions should have been rejected because they were submitted after a court deadline.  Griffith did not make the delay objection either when the instructions were submitted or during the instructions conference.  See 
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

Other Trial Court Rulings

Other issues raised by Griffith include the exclusion of a defense expert, Dr. Garbarino, limitations on defense testimony concerning physical and sexual attacks on Griffith by family members, and refusal to allow defense counsel to ask potential jurors about their feelings toward psychiatrists and psychologists.  Since these alleged errors relate only to the intentional or knowing murder, not the felony murder, there is no need to address them.

That leaves one area concerning the trial that does require some discussion.

Allegations of Prosecutorial Misconduct

In 1990, while incarcerated for Shanks's murder, Griffith killed a fellow inmate, James Jones.  Griffith was convicted of the murder in 1992, the jury rejecting his claim of self-defense.  The prosecution in this case sought to ask Griffith and the defense expert witnesses about the 1990 incident.  Prosecutor Laura Morask contended the questions were necessary to negate the defense theory that Griffith suffered from PTSD and/or ASD when he killed Shanks.  She claimed she had a good faith basis for using the 1990 evidence because the State's expert, Dr. Stipes, had examined the 1990 records and found them relevant to the PTSD defense. 

When the trial court expressed concern about the potential prejudice of the 1990 killing, the State offered to "sanitize" the evidence.  The prosecutor promised:

"We don't have to call it a murder.  We could call it the second confrontation, a confrontation that occurred in 1990 and a stabbing. It doesn't have to be called a murder.  We don't have to go into that the victim died, what his sentence was, or any of that *** We don't have to put in the fact that he was in prison when the stabbing occurred."

Thus assured, the trial court agreed to allow evidence of the 1990 stabbing.

It turned out that Dr. Stipes had never seen records of the 1990 incident, nor did he feel the need to know anything about them.  The record persuades us that the prosecutor had no intention of limiting evidence of the 1990 killing to the question of whether Griffith had PTSD in 1985.  Instead, the 1990 killing was used to convince the jury Griffith was a violent and dangerous man who had a propensity to kill with a knife.

Propensity evidence "overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving of punishment."  
People v. Lindgren
, 79 Ill. 2d 129, 137, 402 N.E.2d 238 (1980).  See also 
People v. Nunley
, 271 Ill. App. 3d 427, 648 N.E.2d 1015 (1995) (reversible error where State's true purpose for offering evidence of defendant's other violent acts was to portray him as a man of bad character).

Improper character argument was injected into the trial during the cross-examination of witnesses and during the State's closing argument.  Objections were made, some sustained, some overruled.  It didn't matter. Nothing stopped this prosecutor.

For example, the questions asked during cross-examination of Griffith:

"Q:    (by Morask) When you were confronted by Mr. James Jones in 1990 in Pontiac, Illinois, you stabbed and killed him, is that correct?

    ***

    Q:    Both times, you walk away from the encounter alive and well and the victims don't walk away at all, they are dead, right?"

So much for not going into the fact that Jones died or that the incident took place in prison.

The promise not to mention the word "murder" was kept until Morask cross-examined Dr. Chapman:

"Q:    Now, you testified in another proceeding with respect to both the first murder and the second murder, is that correct?"

After Griffith's objection was sustained, Morask apologized for using the word "murder."  During her final argument she said: "[Dr. Chapman] couldn't remember whether or not he testified in a prior proceeding about the 1990 murder."

Responding to Griffith's concern that the cross-examination of Dr. Chapman would elicit the 1992 conviction, the trial court ruled: "So, the jury will not be allowed to know there was a finding of guilty."

Morask asked Dr. Chapman:

    "Q:    And you were hired to prepare a report for something called mitigation, correct?

   A:    Yes.

   Q:    Mitigation is basically to find something good to say about someone?

   ***

   Q:    In order to lessen their sentence?"

The jury was not to know Griffith had been sentenced to death in 1992 for the Jones murder. When challenging defense expert Dr. James Garbarino's credentials, Morask asked:

    "Q:   You became involved in this case through the Capital Resource Center, is that correct?

    A:    I believe so, yes.   

    Q:    Weren't you retained in October of 1988 by the Capital Resource Center in the case of the People versus Bobby Simms, a guy who had committed a double murder after a home invasion?

    ***

    Q:    In any event, Capital Resource Center deals with trying to get a prisoner not to get the death penalty?"

    The prosecutor's motion to bar Dr. Garbarino's testimony was granted.  In final argument she asked: "What happened to Dr. Garbarino?"

During her final argument, Morask continued her assault on Griffith's character:

    "You know by this guy's account, people just happen to fall on to his knife.  Everything is an accident.

   ***

    Remember what he said about 1990, he stuck his arm out and James Jones just happened to fall onto the knife.

    ***

    This guy is like a walking barbecue tongs.  Now, he would be a great tool if it wasn't so tragic.  It would be worth a lot of money.  You would put him near your barbeque and hot dogs and hamburgers just fly on and get poked by him.  And that's what he is trying to tell you.  Everybody that just walks by, falls on to his knife. 

    ***

    That's what this defendant does.  Explosions of rage.  Explosions of violence."   

The prosecution's final argument contained improper references to defense counsel--the defense would give Griffith a "license to kill" and the defense argument was "the reason Shakespeare said let's kill all the lawyers"--and improperly attacked defense witnesses: "Dr. Chapman was ridiculous.  For $10,000, the guy couldn't remember his reports *** He couldn't answer a straight yes or no in 50 words *** Because he is getting paid by the word;" "You know.  Officer Richards, the Barney Fife of Yeadon, this guy was a joke."  See 
People v. Moss
, No. 87134, slip op. at 24 (Ill. Oct. 18, 2001) (Morask's reference to defendant's expert witnesses as "cash for trash doctors" described as "completely unacceptable").

It would unduly prolong this Opinion to set out the other instances of prosecutorial excess.

Because we conclude that no rational jury could have found the defendant not guilty of felony murder, we affirm his conviction despite the intentional and systematic misconduct of the prosecutor.  See 
People v. Carter
, 297 Ill. App. 3d 1028, 1037, 697 N.E.2d 895 (1998) (improper evidence and inflammatory State's argument not enough to reverse drug possession charge where evidence of possession was uncontradicted).  We do not want to be understood as condoning the prosecutor's behavior.  It was unprofessional, and it called into question the State's commitment to fair and just enforcement of the law.

The Mandatory Life Sentence

Griffith originally pleaded guilty to the murder of Shanks and was sentenced in 1986 to 35 years imprisonment.  While in prison, Griffith murdered Jones.  In 1992, Griffith was convicted of the Jones murder.  During the sentencing for the Jones murder, the court considered Griffith’s conviction for the Shanks murder in aggravation.  Griffith was ultimately sentenced to death.
(footnote: 1)
 Meanwhile, Griffith filed a post-conviction petition contending his guilty plea for the murder of Shanks was not voluntary.  Ultimately, his conviction was reversed, and a new trial was ordered.  
People v. Griffith
, No. 1–96–0112 (1997) (unpublished order under Supreme Court Rule 23).  After the jury convicted Griffith of felony murder and armed robbery, the trial court sentenced Griffith to a mandatory life sentence pursuant to the sentencing statute.  The court based its ruling on Griffith's 1992 conviction for the murder of Jones.  

The relevant statute as it existed when Griffith was convicted stated: "the court shall sentence the defendant to a term of natural life imprisonment when the death penalty is not imposed if the defendant, (i) has previously been convicted of first degree murder under any state or federal law ***."  730 ILCS 5/5-8-1(a)(1)(c) (West 1998).  Although the statute underwent some changes between the time Griffith committed the Shanks murder to the time he was sentenced to natural life, the statute as it existed when Griffith committed the murder was the same in substance: “if the defendant has previously been convicted of murder under any state or federal law ***, the court shall sentence the defendant to a term of natural life imprisonment.”   Ill. Rev. Stat. 1985, Ch. 38, par. 1005-8-1(a)(1)(c).

Griffith contends the trial court erred in determining a life sentence was required.  

Regardless of which murder occurred first chronologically, the only factor to consider in determining whether a life sentence is mandatory under Section 1005-8-1(a)(1)(c) is whether the defendant has 
previously been convicted
 of murder.  The question is whether the word "previously" applies to the time of the murder or the time of the sentencing.

People ex rel. Daley v. Strayhorn
, 121 Ill. 2d 470, 521 N.E.2d 864 (1988) is instructive.  In that case, the defendant committed a murder in Illinois in 1980.  He committed a murder in Rhode Island in 1982.  In 1984, the defendant was convicted in Rhode Island of the 1982 murder.  In 1986, he was convicted in Illinois of the 1980 murder.  

The issue in 
Strayhorn
 was whether applying the death penalty statute to the 1986 Illinois conviction based on the 1982 Rhode Island conviction violated due process -- that is, could death penalty eligibility be based on the Rhode Island murder and conviction that occurred 
after
 the Illinois murder but before the Illinois conviction?

The court concluded the defendant’s due process rights were not violated by the application of the death penalty statute.  
Strayhorn
, 121 Ill. 2d at 483.  Relying on 
People v. Guest
, 115 Ill. 2d 72, 105, 503 N.E.2d 255 (1986), where the court said “[t]he statute speaks in terms of prior convictions, not prior offenses, leaving no room for judicial interpretation,” the court in 
Strayhorn
 considered the order of the convictions, not the order of the murders, in reaching its conclusion.  
Strayhorn
, 121 Ill. 2d at 483; see also 
People v. Coleman
, 168 Ill. 2d 509, 550-51, 660 N.E.2d 919 (1995) (defendant’s death penalty eligibility upheld where the eligibility was based on convictions for other murders that occurred after the murder for which he was convicted in the case on appeal).

Like the death penalty statute at issue in 
Strayhorn
, Section 5-8-1(a)(1)(c) speaks in terms of convictions, not offenses.  The relevant issue becomes the order of the convictions.  Because Griffith had another conviction for murder when he was sentenced for the murder of Shanks, the court properly applied the mandatory sentence of natural life in accord with the natural life provisions of both the 1985 and 1998 sentencing statutes.  

CONCLUSION

Given the overwhelming evidence in support of the felony murder charge, we are constrained to affirm Griffith's conviction and sentence. 

Affirmed.  

CERDA, and SOUTH, JJ., concur.
 

FOOTNOTES
1:  That conviction currently is the subject of post-conviction proceedings in Livingston County Circuit Court.