# Illinois Official Reports

## Appellate Court

---

*People v. Space*, 2018 IL App (1st) 150922

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTWAN SPACE, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket Nos. 1-15-0922, 1-15-1171 cons. |
| Filed | May 4, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02-CR-22186; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jonathan Krieger, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Conners, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion.<br>Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion. |

¶ 1        Following a 2007 jury trial, defendant-appellant, Antwan Space, was convicted of first degree murder while attempting or committing a forcible felony other than second degree murder in violation of section 9-1(a)(3) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(3) (West 2002)) (felony murder), and sentenced to 45 years' imprisonment. On appeal, defendant contends that (1) his conviction should be reversed because the State did not establish a requisite predicate forcible felony, (2) his conviction should be reversed and the case remanded because the trial court had violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) during jury selection, and (3) his mittimus should be corrected to reflect four additional days of presentencing custody credit. We reverse defendant's conviction for felony murder based on the State's failure to prove both that the asserted predicate forcible felony of aggravated battery with a firearm (1) had an independent felonious purpose and (2) proximately resulted in the victim's death, and we remand the case for a new sentencing hearing on the lesser-included offense of aggravated battery with a firearm.

¶ 2        Defendant was arrested on August 12, 2002, in connection with the August 9, 2002, shootings of cousins Mitchell Barrow and Virgil Thomas. The shootings were witnessed by Tiffany Allen, who was dating Mr. Barrow, and Debra Alexander. Defendant, the ex-boyfriend of Ms. Allen, twice shot Mr. Barrow and then, as Mr. Thomas assisted Mr. Barrow, shot Mr. Thomas. Mr. Barrow died as a result of the injuries he suffered from the gunshots. Mr. Thomas survived. Defendant was charged by indictment with 12 counts of first degree murder as to Mr. Barrow, as well as two counts of attempt (first degree murder), one count of aggravated battery with a firearm, and one count of aggravated battery as to Mr. Thomas.

¶ 3        Before trial, pursuant to defendant's motions, the trial court suppressed his postarrest statements. This decision was affirmed on interlocutory appeal. *People v. Space*, No. 1-05-1811 (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 4        The State proceeded to trial on a single count of first degree murder, which charged that defendant "without lawful justification shot and killed Mitchell Barrow with a firearm during the commission of a forcible felony, to wit: aggravated battery with a firearm" (count 11). All other charges were nol-prossed.

¶ 5        At the start of *voir dire*, the trial court addressed the entire venire as follows:

        "Mr. Space as with other persons charged with crimes is presumed to be innocent of the charge that brings him before you. The presumption of innocence cloak[s] him now at the beginning of the trial and will continue [to] cloak him throughout the course of the proceedings[.] It is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles of law. That is all persons charged with a crime are presumed to be innocent. And that is it is the burden of the State who has brought the charges to prove the [d]efendant guilty beyond a reasonable doubt. What this means [is] the [d]efendant has no obligation to testify in his own behalf or to call any witnesses in his defense. He may simply sit here and rely upon what he and his attorney perceive to be the inability of the State to present sufficient evidence to meet their burden. Should that happen, you will have to decide the case on the basis of evidence presented by the prosecution only.

The fact that the [d]efendant does not testify or present witnesses must not be considered by you in any way in arriving at your verdict. However, should the [d]efendant elect to testify or should his attorney present witnesses in his behalf, you are to consider that evidence in the same manner and by the same standard as evidence presented by the prosecution.

The bottom line is that there is no burden upon the [d]efendant to prove his innocence. It is the State's burden to prove him guilty beyond a reasonable doubt. The prosecutors are here to prosecute the case in support of the charge. The defense attorney is here to represent him and to insure that the State is held to its burden of proof."

¶ 6    To the first panel of 14 prospective jurors as a whole, the court said:

"Should the prosecutor fail to prove its case against the [d]efendant beyond a reasonable doubt, is there anyone of you who would hesitate to sign a verdict of not guilty? If so raise your hand. Let the record reflect there are no raised hands.

Should the prosecutor prove its case against the [d]efendant beyond a reasonable doubt, is there anyone of you who would hesitate to sign a verdict of guilty? If so raise your hand. Let the record reflect that there are no raised hands."

¶ 7    Immediately afterward, the State asked the entire panel:

"I just want to make sure is there anyone here if he did not testify would hold that against the [d]efendant? If you would hold the fact he did not testify would you raise your hand.

Let the record reflect no one has raised their hand."

¶ 8    The court dismissed 7 jurors from the first panel and proceeded to question another panel of 14 prospective jurors. The court asked the entire panel the following:

"If the prosecutor fails to prove its case against the [d]efendant beyond a reasonable doubt, is there anyone of you who would hesitate to sign a verdict of not guilty? If so raise your hand.

Let the record reflect there are no raised hands.

Should the prosecutors prove its case against the [d]efendant beyond a reasonable doubt, is there anyone of you who would hesitate to sign a verdict of guilty? If so raise your hand.

Let the record reflect that there are no raised hands."

¶ 9    The State then asked the panel:

"This is for everybody. The Judge has instructed you that the [d]efendant has the right not to testify. If the [d]efendant does not testify, is there anyone here that would hold that against him? If you would, raise your hand. Let the record reflect no one has raised their hand."

¶ 10    After selecting five more jurors and two alternate jurors from this group, the trial commenced.

¶ 11    In its opening statement, the State presented an overview of its case and the evidence. The State related that defendant was "inspired by jealousy" of Mr. Barrow's relationship with Ms. Allen and his "motive on that night was to murder Mitchell Barrow." Defendant "exacted his intention to get rid of" Mr. Barrow when he took out a handgun and fired it. After twice

shooting Mr. Barrow, defendant's "mission of murder was already accomplished." After that, Mr. Thomas attempted to "get [Mr. Barrow] away from [the] clutches of defendant." Defendant "didn't stop there"; rather he "continued to walk toward [Mr. Barrow and Mr. Thomas] and shoot at [Mr. Barrow] as [Mr. Thomas] was trying to do nothing more but carry him to safety." The State finished its opening statement by telling the jurors that, at the close of evidence, it would ask them to "find [defendant] guilty of the two crimes that he committed that night, the aggravated battery of Virgil Thomas and the first-degree murder of Mitchell Barrow."

¶ 12 The testimony of Mr. Thomas, Ms. Allen, and Debra Alexander provided a background and a description of the shootings, as follows.

¶ 13 Ms. Allen, at the time of the shooting, had been dating Mr. Barrow, the father of two of her children, for four years and lived with him. Ms. Allen had known defendant for years and previously dated him.

¶ 14 During the week leading up to the shootings, Mr. Thomas went with Mr. Barrow to pick up Ms. Allen near the intersection of Douglas Boulevard and Homan Avenue in Chicago. Defendant was there with Ms. Allen, and Mr. Thomas heard defendant tell her that he loved her. Ms. Allen ultimately chose not to get into Mr. Barrow's vehicle. Mr. Barrow became angry and drove away. Later in the week, Mr. Thomas saw defendant with Ms. Allen two additional times.

¶ 15 On the evening of August 9, 2002, Mr. Barrow drove Mr. Thomas, Ms. Allen, Ms. Alexander, and a woman named Kathy to Douglas Park in Chicago. Mr. Barrow parked his vehicle near an area of the park where there were three concrete tables, surrounded by four benches and four or five "real bright" lights. The group exited the vehicle and entered the park. Mr. Thomas and Ms. Alexander, who were dating, sat at one table; Ms. Allen sat at a table next to them. Kathy and Mr. Barrow first sat on a bench and later stood and talked on the nearby sidewalk.

¶ 16 The witnesses testified that they consumed some alcohol prior to the shootings. Mr. Thomas initially testified that he drank "a shot" before acknowledging that he had "some drinks." He maintained that he was not drunk and that his consumption of alcohol did not affect what he saw or heard that night. Ms. Allen testified that she had "not even a half cup" of cognac. Ms. Alexander related that she had "maybe two sips" of cognac.

¶ 17 After a while, two men and a young woman approached the group; one of the men had braids in his hair and was wearing a T-shirt and shorts. Mr. Thomas, in his testimony, identified this individual as defendant. Ms. Allen testified that defendant was one of the men who approached the group that night but that, in all the years she had known defendant, she had never seen his hair in "dreadlocks," "cornrows," or braids.

¶ 18 Defendant first walked to the table where Ms. Allen was sitting. Shortly thereafter, Ms. Allen approached Mr. Barrow and said they should leave the park. Defendant walked over to them and pulled out a silver handgun. While a few feet from Mr. Barrow, defendant pointed the gun at him and fired it.

¶ 19 Ms. Allen ran and did not see whether Mr. Barrow had been struck. She heard five to six gunshots as she escaped. Ms. Allen saw only defendant with a gun that night.

¶ 20     When the gun was fired, Mr. Thomas and Ms. Alexander hid under the table. Mr. Thomas thought defendant's weapon was "automatic" but was "not for sure." Mr. Thomas and Ms. Alexander testified to defendant firing two more shots at that time.

¶ 21     After shooting Mr. Barrow, defendant's gun jammed, and he began to walk away while "fiddling with the gun." Defendant fired more shots into the air. As defendant walked away from him, Mr. Barrow, who was holding the left side of his chest, walked toward Mr. Thomas. Mr. Thomas saw defendant "moving away" and grabbed Mr. Barrow.

¶ 22     Mr. Thomas pulled Ms. Alexander from under the table and held Mr. Barrow as they all went to the vehicle. Mr. Thomas, however, had to return to the park to get the keys. When Mr. Thomas came back to the car, he gave the keys to Ms. Alexander and again grabbed Mr. Barrow to help him into the car. Mr. Barrow had been shot in the chest and was bleeding "real heavy." Mr. Thomas testified that defendant pointed a gun "directly at my way" and fired a shot. Mr. Thomas's leg "gave out," and he realized he had been shot. The bullet went through his hip and thigh, and as a result, Mr. Thomas suffered nerve damage and has difficulty standing on the injured leg.

¶ 23     On August 12, 2002, Mr. Thomas identified defendant in a lineup as the offender. At trial, Mr. Thomas testified that he recognized defendant in the lineup by the white T-shirt and shorts he was wearing and the braids in his hair. When the State showed Mr. Thomas a photo of defendant without braids, wearing shorts and an orange T-shirt, Mr. Thomas testified that it did not depict how defendant appeared in the lineup. The State also showed Mr. Thomas a photo showing the entire lineup, sitting down. Mr. Thomas testified that, although he recalled the individuals in the lineup had been standing, the photo otherwise accurately depicted the lineup. At the request of the State, Mr. Thomas drew an "X" on the lineup photo by the person wearing an orange T-shirt without braids as the one he had identified as the shooter. On cross-examination, Mr. Thomas testified that the photo of the lineup did not accurately depict the lineup he viewed because defendant had been wearing braids.

¶ 24     Detective Patrick Deenihan testified that defendant did not have braids when he was arrested nor when he appeared in the August 12 lineup. In the lineup, defendant did wear an orange T-shirt and long denim shorts. Detective Deenihan confirmed that Mr. Thomas identified defendant in the lineup as the individual who shot him and Mr. Barrow. On August 13, 2002, Ms. Alexander viewed a lineup, which included defendant, but she did not make an identification.

¶ 25     The parties stipulated that (1) Dr. Leon Sykes would testify that, just after midnight on August 10, 2002, Mr. Thomas was treated for a gunshot wound to his left thigh and that Mr. Thomas had alcohol in his system; (2) Dr. Sykes would testify that he performed surgery on Mr. Barrow on August 10, 2002, and recovered a metal bullet from his body; (3) Lilly Ford would testify that, at approximately 11:30 p.m., she was sleeping at her residence on Douglas Boulevard in Chicago when falling glass from her window awoke her and she later found pieces of a bullet, which were recovered by police; (4) an evidence technician would testify that shortly after midnight on August 10, 2002, he photographed and collected four fired cartridge cases on Douglas Boulevard and photographed blood on the street near Mr. Barrow's car; (5) an evidence technician would testify to recovering a bullet in Ms. Ford's home; and (6) there was a proper chain of custody for the recovered bullets and fired cartridge cases.

¶ 26     Dr. Kendall Crowns, a pathologist, testified that, on August 11, 2002, he performed an autopsy of Mr. Barrow and found that he had sustained two gunshot wounds—one to his chest

and another to his left arm. Dr. Crowns concluded that the cause of death was multiple gunshot wounds and the manner of death was homicide. Mr. Barrow had a blood-alcohol content of 0.074%, the equivalent of roughly three to four cans of beer.

¶ 27 John Onstwedder, an expert in the field of fingerprint identification, testified that there were no latent fingerprints on the four cartridge cases he examined. Mr. Onstwedder explained that it is possible for a person to touch an object and not leave fingerprints, depending on such factors as a lack of sufficient greases or oils on the finger to make a fingerprint and the touched object having a curved surface.

¶ 28 Aaron Horn, an expert in firearms and tool mark identification, examined the four fired cartridge cases recovered from Douglas Boulevard, the piece of bullet found by Ms. Ford, and the bullet recovered from Mr. Barrow's body. Mr. Horn testified that a difference between a revolver and a semiautomatic firearm is that a semiautomatic firearm ejects fired cartridge casings, whereas the fired cartridge cases of revolvers have to be physically removed. In this case, all cartridge cases and bullet pieces were designed for a .38 caliber firearm. Mr. Horn could neither eliminate nor identify the four cartridge cases, which were designed for a semiautomatic firearm, as having been fired from the same firearm. However, Mr. Horn concluded that the bullet and bullet piece he examined were fired from the same firearm, but he was unable to determine if they were fired by a revolver or semiautomatic firearm.

¶ 29 On cross-examination, Mr. Horn acknowledged that he could not conclude that the fired cartridge cases and the bullets he examined were discharged from the same firearm. Mr. Horn also could not make any conclusions about the fragment of a bullet that Ms. Ford found in her apartment the day after the shooting because it was unsuitable for examination.

¶ 30 The State rested. Defendant filed a motion for a directed verdict, arguing that the eyewitnesses did not make a credible identification of him as the shooter. The trial court denied the motion. Defendant waived his right to testify and rested.

¶ 31 In closing arguments, the State argued that defendant approached Douglas Park "scoping out his opportunity." The State also referred to Mr. Thomas when it described "the defendant point[ing] that gun now unjammed, that .380 and fir[ing] at him." The State further argued:

"You know that whoever fired that gun caused and did the act[,] the act that killed him, the defendant. *** You know from what we talked about he is the one that did that. And that when the defendant did so he was committing the offense of aggravated battery with a firearm, so that charge is called felony murder rule.

How that works is if we have prove[d] to you, which we have, that the defendant committed aggravated battery with a firearm upon Virgil Thomas and Mitchell Barrow died during that course of events, during that time, he is guilty of his murder. I think that is direct and that is to the point.

To prove another [instruction] Honorable Judge Clay is going to read to you deals with aggravated battery, it says 'a person commits the offense of aggravated battery with a firearm when he, by means discharging a firearm, knowingly causes injury to another person.'

Well, he did discharge a firearm[;] we have the casings, the testimony of Horn, *** the bullet in Mitchell Barrow, the bullet that went through Mitchell—I mean Virgil that you have in his leg.

Of course he did that. He performed the act. He shot a firearm at Virgil Thomas as Virgil was rounding that car ***. And common sense tells you *** that he knew he was going to cause injury and, in fact, he did. We have proven that.

And therefore because Mitchell dies during that time he is guilty. It is done."

¶ 32 In rebuttal, the State also argued that defendant murdered Mr. Barrow because of "his decision to act jealous[ly] on that night and to rub [Mr. Barrow] out." The State went on to argue:

"You heard all about the jealous rage[; maybe words weren't] spoken ***, but *** with something better [than] that even more tangible, even more concrete, it was spoken by this defendant right over here with every pull of that trigger, with every bang of that gun.

This defendant sent his message of jealousy and right [toward Mr. Barrow]. He killed him with [every one] of those messages, just like I told you in opening statements. Just like I told you what this evidence would have proved and it has. This defendant shot [Mr. Barrow] until he got rid of him. And the one person who was able to take him to *** safety, his cousin[,] pulled him away. When he pulled him away that is why this defendant didn't stop his mission right then and there. He thought [maybe] this guy [was] going to save his life, [maybe] this guy [was] going to get him to safety or wait a minute more. So [maybe] this guy saw my face, well, yeah, [Mr. Thomas] did see his face. This defendant had to know that he had been seen a couple of days earlier by [Mr.] Mitchell when [Mr.] Mitchell was trying to pick [up] Tiffany ***. There is no question about it, this defendant had a motive that night. ***

***

[Defendant] is the shooter from that night, is the killer, is the man who committed aggravated battery upon Virgil Thomas and murdered in cold blood Mitchell Barrow."

¶ 33 After closing arguments, the trial court instructed the jury as follows:

"[A] person commits the offense of first degree murder when he kills an individual in performing the act which causes death he was committing the offense of aggravated battery with a firearm. A person commits the offense of aggravated battery with a firearm when he, by means of discharging of a firearm, knowingly causes injury to another person.

***

To sustain the charge of first degree murder the State must prove the following propositions: First, that the defendant performed the act which caused the death of Mitchell Barrow ***. [S]econd, when the defendant did so he was committing the offense of aggravated battery with a firearm."

¶ 34 The jury found defendant guilty of felony murder. After denying defendant's oral motion for a new trial, the trial court sentenced him to 45 years' imprisonment. A timely appeal was not filed.

¶ 35 In 2011, defendant filed a *pro se* petition seeking relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)), which alleged his trial counsel was ineffective for failing to file a notice of appeal from his conviction. Postconviction counsel filed an amended petition, which sought leave to file a late notice of appeal from defendant's conviction for felony murder. The trial court granted this request, and postconviction counsel

filed a notice of appeal (No. 1-15-0922) from defendant's conviction. See *People v. Ross*, 229 Ill. 2d 255, 268-71 (2008) (when a postconviction petitioner demonstrates that counsel was ineffective for failing to file a notice of appeal, the trial court may allow the petitioner leave to file a late notice of appeal). Defendant also filed a *pro se* notice of appeal (No. 1-15-1771). We consolidated the appeals.

¶ 36   On appeal, defendant first contends that his conviction for felony murder should be reversed because the State did not establish a valid predicate forcible felony to sustain his conviction. Specifically, defendant argues that his felony murder conviction cannot be based upon the predicate felony of the aggravated battery with a firearm of Mr. Thomas where the evidence failed to establish both that the aggravated battery with a firearm of Mr. Thomas had an independent felonious purpose apart from the murder itself and proximately caused Mr. Barrow's death. We will address each of defendant's contentions, in order.

¶ 37   The State urges that defendant forfeited this issue in that he did not raise it below by any objection at trial or in a written posttrial motion. We disagree. Defendant's argument, as to the State's failure to prove a valid predicate forcible felony, is directed toward the sufficiency of the evidence and may be raised for the first time on direct appeal. *In re Dionte J.*, 2013 IL App (1st) 110700, ¶¶ 78-79 (where " 'a defendant makes a challenge to the sufficiency of the evidence, his or her claim is not subject to the waiver rule and may be raised for the first time on direct appeal' " (quoting *People v. Woods*, 214 Ill. 2d 455, 470 (2005))).

¶ 38   In this case, defendant was charged with felony murder based on the theory that, in performing the acts which caused Mr. Barrow's death, he was committing aggravated battery with a firearm.

¶ 39   The first degree murder statute sets forth three mental states or conduct that may accompany acts that cause a murder. *People v. Davis*, 233 Ill. 2d 244, 263 (2009) ("A defendant can (1) intend to kill or do great bodily harm to the victim (intentional murder), (2) know that his acts create a strong probability of death or great bodily harm to the victim (knowing murder, also known as strong probability murder), or (3) attempt or commit a forcible felony other than second degree murder (felony murder)." (citing 720 ILCS 5/9-1(a) (West 2004)).

¶ 40   Under the felony murder statute, " '[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he is attempting or committing a forcible felony other than second degree murder.' " *People v. Belk*, 203 Ill. 2d 187, 192 (2003) (quoting 720 ILCS 5/9-1(a)(3) (West 1996)); 720 ILCS 5/9-1(a)(3) (West 2002). Aggravated battery, resulting in great bodily harm or permanent disability or disfigurement, is a forcible felony for purposes of the felony murder statute. 720 ILCS 5/2-8 (West 2002). A person commits aggravated battery with a firearm when he, in committing a battery, knowingly or intentionally by means of the discharging of a firearm causes any injury to another person. 720 ILCS 5/12-4.2(a)(1) (West 2002).

¶ 41   We recognize that the felony murder charge against defendant did not specifically name the victim of the predicate felony of aggravated battery with a firearm. It is defendant's position on appeal that the State "offered two theories of the victim of that predicate [aggravated battery with a firearm], suggesting at points that it was [Mr.] Barrow and at other points that it was Virgil Thomas." The State in response argues that its sole theory at trial was that Mr. Thomas was the victim of the aggravated battery with a firearm, which was the

asserted predicate forcible felony, for the felony murder of Mr. Barrow. As to this issue, we agree with the State.

¶ 42    The aggravated battery charges of the indictment, including the aggravated battery with a firearm count, listed only Mr. Thomas as the victim. The State, in its prosecution of the felony murder charge, made clear that it was seeking a conviction based on the aggravated battery with a firearm of Mr. Thomas. We, therefore, will consider only whether the aggravated battery of Mr. Thomas, based on the evidence, can serve as the requisite forcible felony to sustain defendant's conviction for felony murder.

¶ 43    Although, in rejecting the State's forfeiture objection, we agreed that defendant's argument is directed toward the sufficiency of the evidence, the ultimate issue as to whether the aggravated battery with a firearm constitutes a proper predicate felony in this case is one of law, which we review *de novo*. *People v. Davison*, 236 Ill. 2d 232, 239 (2010) (citing *People v. Pelt*, 207 Ill. 2d 434, 439 (2003)).

¶ 44    The purpose of the felony murder statute is to limit the violence that accompanies the commission of forcible felonies, so that anyone engaged in such violence will automatically be subject to a murder prosecution should someone be killed during the commission of a forcible felony. *Belk*, 203 Ill. 2d at 192; *People v. Johns*, 345 Ill. App. 3d 237, 242 (2003) ("Felony murder seeks to deter persons from committing forceable felonies by holding them responsible for murder if a death results."). To this end, the offense of felony murder is unique because, in order to commit felony murder, the defendant need not have had the intent to kill. *Davison*, 236 Ill. 2d at 239-40; *People v. Jones*, 376 Ill. App. 3d 372, 387 (2007) (felony murder derives its mental state from the underlying offense); see also *People v. Dekens*, 182 Ill. 2d 247, 259 (1998) (Heiple, J., dissenting) ("In Illinois, the only type of first degree murder which does not require proof of a specific *mens rea*, or intent, on the part of the defendant is felony murder. [Citation.] The felony-murder doctrine thus stands as a substitute for intent in cases where the defendant's commission of a felony causes another person's death."). Therefore, in order to sustain defendant's felony murder conviction, the State is not required to prove that he had the intent to kill. *People v. Shaw*, 186 Ill. 2d 301, 322 (1998); *People v. Dennis*, 181 Ill. 2d 87, 105 (1998).

¶ 45    As a result of this distinction from other forms of first degree murder, our supreme court has repeatedly expressed its concern that a felony murder charge may, in effect, improperly allow the State to both eliminate the offense of second degree murder and avoid the burden of proving an intentional or knowing first degree murder. See *Davison*, 236 Ill. 2d at 240 (and cases cited therein). This concern was especially paramount in cases where the same conduct forms the basis of the predicate felony and the killing. See *People v. Morgan*, 197 Ill. 2d 404 (2001). Addressing this situation, our supreme court in *Morgan* held that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Id.* at 447. Moreover, as stated in *Morgan*, in order to support a charge of felony murder, "the predicate felony underlying a charge of felony murder must have an independent felonious purpose," *i.e.*, it must have some independent motivation or purpose apart from the murder itself. *Id.* at 458; *People v. Alvarez-Garcia*, 395 Ill. App. 3d 719, 733-34 (2009).

¶ 46    Here, the act constituting the aggravated battery of Mr. Thomas was not an act that gave rise to or was inherent in the murder of Mr. Barrow and, thus, did not run afoul of *Morgan* on

- 9 -

this basis. The State, however, did not establish that the aggravated battery with a firearm of Mr. Thomas had an independent felonious purpose apart from the murder of Mr. Barrow.

¶ 47　　The State's theory underlying the prosecution of the felony murder charge, as reflected in its opening statement and closing arguments, supports this conclusion. In opening statements, the State told the jury that, on the night of the shootings, defendant went to Douglas Park with a "mission of murder" and a "motive" to "murder" and "get rid of" Mr. Barrow. The State further stated that defendant had this "murderous intent" when he shot Mr. Thomas. In closing arguments, the State again asserted that defendant had the motive "to rub [Mr. Barrow] out" and that he came to the park to carry out that intent. The State further contended that defendant continued his mission to murder Mr. Barrow when he shot Mr. Thomas because defendant thought Mr. Thomas was "going to save [Mr. Barrow's] life, [maybe] this guy is going to get him to safety."

¶ 48　　The State's arguments at trial, as to defendant's felonious purpose, are supported by the evidence presented. The record shows that, when defendant fired the gun in the direction of Mr. Thomas, Mr. Thomas was holding Mr. Barrow in his arms. It is possible, as argued by the State, that defendant fired the gun at that time to prevent Mr. Thomas from saving Mr. Barrow's life. But it is also possible that defendant was intending again to shoot Mr. Barrow but he hit Mr. Thomas instead. Both of these reasonable possibilities tend to show that defendant was acting with the same felonious purpose of accomplishing the murder of Mr. Barrow when he committed the aggravated battery of Mr. Thomas. Our examination of the record does not yield that defendant's conduct in shooting Mr. Thomas clearly exhibited a distinct felonious purpose, other than his motive and purpose to accomplish the murder of Mr. Barrow.

¶ 49　　With regard to causation, defendant argues that there is no evidence that Mr. Barrow's death was the proximate result of the shooting of Mr. Thomas where Mr. Barrow was fatally wounded before the aggravated battery with a firearm of Mr. Thomas took place. In its brief, the State does not specifically respond to this causation argument. We agree with defendant.

¶ 50　　"Illinois adheres to the 'proximate cause' theory of liability for felony murder, meaning 'liability attaches under the felony-murder rule for any death proximately resulting from the unlawful activity.' " *People v Brown*, 2015 IL App (1st) 131552, ¶ 30 (quoting *People v. Lowery*, 178 Ill. 2d 462, 465 (1997)); see also *Shaw*, 186 Ill. 2d at 322 ("Felony murder depends solely on a cause and effect relationship between the crime committed and the resulting murder to impose liability."). "For the felony-murder rule to attach, the act causing the death must both occur during the underlying felony and be the direct and proximate result of the felony." *Johns*, 345 Ill. App. 3d at 244. Stated differently, the focus of the proximate cause theory of liability is: "when a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act." *Lowery*, 178 Ill. 2d at 467; *Jones*, 376 Ill. App. 3d at 387.

¶ 51　　Here, the evidence showed that defendant began his crime spree that night by twice shooting Mr. Barrow, with one of those gunshots hitting Mr. Barrow's chest. Only after defendant twice shot Mr. Barrow (and dealt with the weapon becoming jammed) did he turn his gun on Mr. Thomas. Given this sequence of events, the act causing the death—the shooting of Mr. Barrow—occurred before and not during the asserted predicate felony—the aggravated

battery with a firearm of Mr. Thomas. See *Johns*, 345 Ill. App. 3d at 244 ("[f]or the felony-murder rule to attach, the act causing the death must *** occur during the underlying felony").

¶ 52    Moreover, Mr. Barrow's death was not the proximate result of the aggravated battery with a firearm of Mr. Thomas. There was no direct or circumstantial evidence showing that, by shooting Mr. Thomas in the leg, defendant set in motion a chain of events that resulted in Mr. Barrow's death. In fact, the medical evidence was that Mr. Barrow died of the gunshot wounds he sustained prior to defendant's act of shooting Mr. Thomas. Therefore, Mr. Barrow's death was not the result of the aggravated battery with a firearm of Mr. Thomas. It was the earlier shootings of Mr. Barrow that led to his death. Because the aggravated battery with a firearm felony did not meet the causation requirement of the felony murder rule, we find that the aggravated battery with a firearm of Mr. Thomas was not a valid predicate felony.

¶ 53    At oral argument, the State maintained that the aggravated battery with a firearm of Mr. Thomas was a valid predicate felony, despite the fact that it occurred after Mr. Barrow received his fatal gunshot wounds. The State cited *People v. Griffith*, 334 Ill. App. 3d 98 (2002),[1] and *People v. Stout*, 122 Ill. App. 3d 254 (1984), in support of its argument. We disagree.

¶ 54    The defendant in *Griffith* was living in the victim's apartment. *Griffith*, 334 Ill. App. 3d at 100. Following an argument after the victim left the apartment, the defendant pried open the victim's safe in an attempt to take his cash but found no money. *Id.* at 101. The victim then returned to the apartment. *Id.* The defendant, fearing the victim would hurt him or call the police when he discovered that he had pried open the safe, beat and stabbed the victim. *Id.* The defendant then took the victim's wallet. *Id.* The defendant later made statements that he had killed the victim for the money. *Id.* at 102. At trial, however, the defendant testified that he took the wallet as an "afterthought." *Id.* at 111. The defendant was found guilty of felony murder and armed robbery. *Id.* at 109. This court affirmed the defendant's convictions, finding:

> "The afterthought defense does not work. [The defendant] was able to take the money because he had rendered [the victim] helpless. The jury did not have to find [the defendant] formed the criminal intent to commit armed robbery before committing the murder. [*People v. Pitsonbarger*, 142 Ill. 2d 353, 372-73 (1990)] ('it is sufficient that the State proved the elements of the crime and the accompanying felonies were part of the same criminal episode')." *Griffith*, 334 Ill. App. 3d at 111.

¶ 55    A similar result was reached in *Stout*. There, the defendant and the codefendant argued with and then beat the victim because the victim refused to give the defendant a drink. *Stout*, 122 Ill. App. 3d at 256-57. During the beating, the defendant took the victim's watch. *Id.* at 257. The defendant, on appeal, argued that he took the watch as an "afterthought." *Id.* at 260. The appellate court affirmed the defendant's felony murder conviction based on the robbery, stating:

> "In any event, no Illinois case has stated that the fact that robbery is an afterthought of acts of beating prevents the operation of the felony murder rule. The rule is broad in scope. [Citation.] Responsibility attaches to an accused 'for those deaths which occur during a [forcible] felony and which are the foreseeable consequence of his initial

_____

[1]*Habeas corpus* relief granted on other grounds by *United States ex rel. Griffith v. Hulick*, 587 F. Supp. 2d 899 (N.D. Ill. 2008).

criminal acts.' [Citation.] According to one of [the defendant's] statements, the striking of [the victim] was part of the procedure by which the watch was forcibly removed from [the victim's] person. Robbery is not a specific intent crime, and neither [the defendant] nor [the codefendant] needed to have the intent to deprive [the victim] of his property at the time the beating started in order for that conduct to be part of the offense of robbery. Considering [the victim's] age and physical condition, his death was a foreseeable consequence of the beating shown by the evidence. The evidence supported a determination that a felony murder occurred." *Id.* at 260-61.

¶ 56    In each case, the defendants argued that the actual taking occurred after the conduct which resulted in the death of the victims and, therefore, robbery could not serve as a predicate felony. The reviewing courts rejected those arguments because the offense of robbery is not a specific intent crime, *i.e.*, the taking by force or threat of force is the gist of the offense of robbery and no intent need be charged. See *People v. Banks*, 75 Ill. 2d 383, 391-92 (1979). As such, there was no requirement that the defendants in *Griffith* and *Stout* formed the intent to commit the robbery before they began to act in order for the State to establish a valid predicate felony. Rather, the robberies—the predicate felonies—began and were accomplished by the conduct that resulted in the victims' deaths. Accordingly, in each case, because the conduct causing the death of the victim occurred during the predicate felony and the death of the victim was the proximate result of that conduct, a conviction for felony murder was appropriate.

¶ 57    Here, unlike in *Griffith* and *Stout*, the predicate felony—the aggravated battery with a firearm of Mr. Thomas—did not begin, nor was it accomplished, by the conduct that resulted in the death of Mr. Barrow. Rather, as mentioned, defendant began his crime spree by twice shooting Mr. Barrow. One of those gunshots hit Mr. Barrow in the chest and resulted in his death. Defendant then turned his gun on Mr. Thomas. Therefore, the conduct causing the death of Mr. Barrow did not occur during the predicate felony—the aggravated battery with a firearm of Mr. Thomas—nor was it the proximate result of Mr. Barrow's death.

¶ 58    At oral argument, the State, in addressing proximate cause, also maintained that, by shooting Mr. Thomas, defendant prevented Mr. Barrow from receiving timely medical treatment, which then led to his death. The State did not present this theory of proximate cause at trial or in its brief. (The State did assert that defendant's felonious purpose in shooting Mr. Thomas was, possibly, to prevent him from saving Mr. Barrow.) Therefore, the argument has been forfeited. Ill. S. Ct. R. 341(h)(7), (i) (eff. Nov. 1, 2017).

¶ 59    Forfeiture aside, the State's argument ignores the fact that defendant's act of shooting Mr. Barrow occurred before the aggravated battery with a firearm of Mr. Thomas. The argument also ignores that it was the shots fired at Mr. Barrow which set in motion his murder, and not the aggravated battery with a firearm of Mr. Thomas. In addition, there was no evidence that Mr. Barrow would have survived his gunshot wounds if he had reached the hospital sooner. Even if there was such evidence, the State's argument is essentially another way of saying that defendant was so determined to kill Mr. Barrow that he shot Mr. Thomas to prevent him from saving Mr. Barrow. This argument then tacitly acknowledges that the predicate felony—the aggravated battery with a firearm—was committed to effectuate the murder of Mr. Barrow and had the same felonious purpose.

¶ 60    Accordingly, given our conclusion that the aggravated battery with a firearm did not have an independent felonious purpose and that the aggravated battery with a firearm of Mr.

Thomas and the murder of Mr. Barrow did not have the necessary causal relationship, we must reverse defendant's felony murder conviction.

¶ 61    However, defendant concedes, and we agree, that "the predicate felony underlying a charge of felony murder is a lesser-included offense of felony murder." *People v. Smith*, 233 Ill. 2d 1, 17 (2009); see also *People v. Rosenthal*, 394 Ill. App. 3d 499, 508 (2009) (holding that aggravated battery with a firearm is a lesser-included offense of felony murder, predicated on aggravated battery with a firearm and, also, mentioning that "inherent in the verdict finding defendant guilty of murder, the jury also found defendant guilty beyond a reasonable doubt of the predicate aggravated battery with a firearm"). In this court, defendant does not challenge the sufficiency of the evidence as to the lesser-included offense of the aggravated battery with a firearm of Mr. Thomas. Moreover, our review of the evidence shows that the State proved, beyond a reasonable doubt, that defendant shot Mr. Thomas in the leg without justification and that Mr. Thomas suffered significant and permanent injury as a result of the gunshot. As such, although we reverse defendant's conviction for felony murder, we will consider his argument regarding the propriety of the trial court's jury admonishments.

¶ 62    Defendant maintains that the trial court did not comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when it failed to ensure the prospective jurors understood and accepted each principle set out in the rule. Whether the trial court complied with Rule 431(b) presents a question of law that we review *de novo. People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 63    As a threshold matter, defendant forfeited this issue on appeal because he did not object below to the trial court's failure to comply with Rule 431(b), nor did he include the issue in his posttrial motion. *Id.* ¶ 47. However, the plain-error doctrine allows a reviewing court to consider a forfeited error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). In plain-error review, the burden of persuasion rests with the defendant. *Thompson*, 238 Ill. 2d at 613. The first step of plain-error review is determining whether any error occurred. *Id.*

¶ 64    The State concedes, and we agree, that the trial court's failure to expressly ask the prospective jurors if they understood Rule 431(b) principles amounts to error. See *People v. Wilmington*, 2013 IL 112938, ¶ 32. Here, although the trial court admonished the prospective jurors regarding the principles set out in Rule 431(b), the record shows that the court did not expressly ask the prospective jurors if they understood those principles. It is well settled that a trial court errs when it fails to ask prospective jurors whether they both understand and accept the principles set forth in Rule 431(b). *Belknap*, 2014 IL 117094, ¶ 46. Furthermore, the failure to ask the jury whether it understands the principles of Rule 431(b), by itself, constitutes error. *Id.* Therefore, we must consider whether the trial court's error prejudiced defendant. *People v. Herron*, 215 Ill. 2d 167, 187, 192 (2005).

¶ 65    Defendant does not argue that the trial court's violation of Rule 431(b) is reviewable under the second prong of plain error, permitting review where an error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial system. See *Thompson*, 238 Ill. 2d at 610-15 (finding that a violation of Rule 431(b) does not satisfy the second prong of plain error). Rather, defendant argues, under the first prong of the plain-error

doctrine, that the error threatened to tip the scales of justice against him because the evidence at trial was closely balanced.

¶ 66    Under the first prong of plain error, "prejudice rests not upon the seriousness of the error but upon the closeness of the evidence." *People v. Sebby*, 2017 IL 119445, ¶ 68. As a result, defendant must show that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Herron*, 215 Ill. 2d at 187; see also *Sebby*, 2017 IL 119445, ¶¶ 51, 68-69 ("The only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced."). This requires the reviewing court to undertake a common sense analysis of all evidence in context (*Belknap*, 2014 IL 117094, ¶ 50), including evidence regarding the witnesses' credibility and evidence on the elements of the charged offense. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 67    Because we have reversed the felony murder conviction but affirmed the finding of guilty as to the lesser included offense of aggravated battery with a firearm, we consider whether the evidence as to that offense was closely balanced.

¶ 68    In this case, two witnesses, Ms. Allen and Mr. Thomas, testified consistently as to seeing defendant at the park with a gun on the night in question. Mr. Thomas testified that he was assisting Mr. Barrow into the car when defendant pointed a gun in his direction and then fired the gun. The bullet struck Mr. Thomas in the leg and went through his hip and thigh. As a result, Mr. Thomas suffered and continues to have nerve damage and difficulty standing on the injured leg.

¶ 69    Mr. Thomas's testimony was corroborated by the parties' stipulation that, if called, an evidence technician would testify that, shortly after the incident, he photographed and collected four fired cartridge cases on Douglas Boulevard and photographed blood on the street near Mr. Barrow's car.

¶ 70    After the shooting, Mr. Thomas identified defendant from a lineup as the shooter. See *People v. Starks*, 2014 IL App (1st) 121169, ¶ 48 ("It is well established that a single witness's identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification."). Although Mr. Thomas's identification contained inconsistencies, we note that these inconsistencies were fully explored at trial and do not render his identification invalid but, rather, go to the weight to be afforded to his testimony by the trier of fact. See *People v. Dukes*, 40 Ill. App. 3d 490, 492 (1976).

¶ 71    The evidence of the aggravated battery with a firearm of Mr. Thomas, in this case, was not closely balanced, and defendant was not prejudiced by the trial court's error during *voir dire*. Thus, he has forfeited review of this error.

¶ 72    Finally, although the parties agree that defendant's mittimus should be corrected to reflect four additional days of sentence credit for the time defendant spent in presentence custody, we need not consider this argument, as we are remanding for resentencing on the lesser-included offense of aggravated battery with a firearm.

¶ 73    In sum, we reverse defendant's conviction for felony murder but affirm the finding of guilt as to the lesser-included offense of the aggravated battery with a firearm of Mr. Thomas and remand for resentencing on that offense. See *Rosenthal*, 394 Ill. App. 3d at 508, 516 (holding aggravated battery with a firearm is a lesser-included offense of felony murder predicated on aggravated battery with a firearm and, upon reversing defendant's conviction for felony murder, remanding the case for sentencing on defendant's conviction for aggravated battery

with a firearm).

¶ 74          Affirmed in part, reversed in part, and remanded.