2022 IL App (1st) 200997-U

No. 1-20-0997

Order filed February 16, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 10252 |
| | ) | |
| TREVOR ROBINSON, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for aggravated discharge of a firearm in the direction of a person are affirmed over his challenge to the sufficiency of the evidence. Defendant's three convictions and three concurrent 15-year sentences are affirmed over his contentions that they violate the one-act, one-crime rule and that he should receive day-for-day good time credit.

¶ 2    Following a bench trial, defendant Trevor Robinson was found guilty of three counts of aggravated discharge of a firearm in the direction of a person and sentenced to 15 years' imprisonment on each count, to run concurrently. On appeal, he contends that the State failed to

prove him guilty beyond a reasonable doubt, that his three convictions violate the one-act, one-crime rule of *People v. King*, 66 Ill. 2d 551 (1977), and that he should receive day-for-day good time credit. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with four counts of first-degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2016)), six counts of attempt murder (720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016)), and three counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)). Relevant here, the three aggravated discharge of a firearm counts alleged that defendant knowingly discharged a firearm in the direction of Antonya Ringgold, Michelle Ringgold, and Monay Ringgold, respectively, on June 3, 2017.

¶ 5                                       A. Trial

¶ 6                                    1. State's Case

¶ 7      Antonya, Michelle, and Monay Ringgold lived with their family, including Novajah Ringgold, on the 6100 block of South Throop Street.[1] Novajah, Antonya, and Monay were siblings; Michelle was their cousin. At approximately 11:45 a.m. on June 3, 2017, Antonya looked out her bedroom window and saw three men standing across the street, including defendant, whom she identified in court, and a man wearing a red hat. The men yelled obscenities at her, so Antonya ran outside to the front of her house with Michelle and Monay. Novajah ran across the street and had a "heated" argument with the three men while Antonya stood next to him. When the argument ended, Antonya bent over to "fix" her shoe, then "turned almost like to walk away, and that's when

---

[1] Several of the individuals involved in this incident share the last name Ringgold, so we refer to them by their first names for clarity.

[defendant] pulled the gun," a revolver, from his waist. Defendant pointed the revolver toward Novajah, Antonya, Michelle, and Monay, and fired from approximately 10 feet away. Antonya could not recall how many times defendant fired. The man in the red hat also discharged a firearm in the same direction as defendant. Antonya testified that she did not see anyone struck by a bullet, but also testified that she saw defendant shoot and kill Novajah. Police arrived and Antonya told a sergeant that defendant "had done it." Antonya identified three photographs of her cell phone displaying Facebook messages between her and "Trevon Roberson," whom she identified as defendant. She also identified two photographs of defendant on another cell phone. In addition, Antonya identified a photograph of defendant that she was shown the day of the shooting and during a meeting with an assistant State's Attorney (ASA) on the night of June 13, 2017, and the early morning hours of June 14, 2017. The State moved these photographs into evidence.

¶ 8     Michelle Ringgold testified that she saw Antonya and Novajah across Throop "exchanging words" with defendant, whom she identified in court. When the argument ended, Michelle heard defendant call Monay a "b***h," so Michelle, Novajah, Antonya, and Monay approached defendant and Novajah said that he was being disrespectful. Defendant pulled a firearm from his waistband and pointed it toward Michelle, Novajah, Antonya, and Monay, who were standing shoulder-to-shoulder. Defendant fired three times. Michelle saw another person "reach for a gun" but did not see that person fire; defendant was the only person she saw discharge a firearm. On June 13, 2017, Michelle identified defendant as the "man that shot [her] cousin" in a photo array. The following morning, Michelle identified defendant in the photo array to an ASA. In court, she identified the photo array, an individual photograph of defendant that she signed, and a photo array advisory form that she signed, and the State moved them into evidence.

¶ 9    Monay Ringgold testified that she was standing on the curb near her house when she saw Novajah speaking to three men on the sidewalk across the street. Antonya was standing near Novajah, but Michelle was not. Monay asked what happened and walked into the street toward Novajah, Antonya, and Michelle. Defendant, whom Monay identified in court, called her a "b***h." Novajah approached defendant and told him not to disrespect Monay. Monay was standing to Novajah's right side and Antonya was standing to his left. Novajah grabbed Antonya and Monay's wrists and turned toward their house. Monay then saw defendant pull a firearm from his side and shoot Novajah from approximately three feet away. Antonya, Monay, and Michelle were standing next to Novajah when defendant shot him. Monay ran toward her house, looked back, and saw Novajah lying motionless on the ground. Police arrived shortly thereafter. Monay identified defendant as the person who shot Novajah in a lineup on June 13, 2017. In court, she identified a photograph of the lineup and a lineup advisory form that she signed, and the State moved them into evidence.

¶ 10   In a series of photographs, Antonya, Michelle, and Monay identified their house, the location across Throop where defendant and the two other men were standing, and the gangway that defendant ran through after the shooting. The State moved these photographs into evidence.

¶ 11   Shonnette Ringgold testified that Novajah was her son. Shortly after 11:45 a.m. on June 3, 2017, Shonnette heard "some shooting," ran to the front of her house, and saw Novajah lying on the ground. Shonnette later identified Novajah's body at the Medical Examiner's office. She identified a photograph of Novajah as he appeared in life and the State moved it into evidence. The parties stipulated that Shonnette would also identify a photograph of Novajah as he appeared in death, which the State moved into evidence.

¶ 12    Chicago police sergeant Syed Quadri testified that he was on duty, in uniform, and driving a marked police vehicle on June 3, 2017. At approximately 11:48 a.m., he responded to a call of shots fired on the 6100 block of South Throop. When he arrived, he saw a man lying face down in the street with a large amount of blood coming from his body and "a large crowd and a lot of chaos in the street, a lot of yelling and pointing." Some of the people were yelling that the shooter, "Trevon," ran through a gangway, and Antonya said that "Trevon Roberson" was one of the shooters. Quadri and other officers went through the gangway and searched a back yard and an alley, but did not see anyone, so they returned to the scene. Quadri identified two photographs from the Facebook profile of "Trevon Roberson," which Antonya showed him. He also identified a video recording from his body camera and confirmed that it accurately depicted this incident. The State moved this video into evidence. The video depicts a man that Quadri identified as the victim lying on the street near the curb with a woman kneeling near him.

¶ 13    The parties stipulated that Chicago Fire Department paramedic Jaffrey Thrun was on duty in an ambulance on June 3, 2017. He was dispatched to assist a gunshot victim on the 6100 block of South Throop and arrived on scene at 11:55 a.m. He found Novajah lying face down in the street, unresponsive and struggling to breathe, but with a pulse. Novajah was moved to the ambulance and Thrun found gunshot wounds to Novajah's right upper chest, lower back, and lower extremity. Novajah's pulse stopped as he was being transported to Christ Hospital.

¶ 14    Evidence technician James McDonough testified that he was assigned to a homicide investigation on the 6100 block of South Throop at approximately 12:36 p.m. on June 3, 2017. He recovered and inventoried three .380-caliber fired cartridge cases from a semiautomatic handgun, among other items. In court, McDonough identified the three fired cartridge cases he recovered,

and the State moved them into evidence. McDonough also identified a series of photographs of the scene that he and his partner took, which the State moved into evidence. The photographs depict what McDonough identified as three .380-caliber fired cartridge cases. One cartridge case is on the sidewalk across Throop from the Ringgolds' house, and two are in the grass between the sidewalk and Throop, also across the street from the Ringgolds' house.

¶ 15 Detective John Otto testified that he was on duty on June 3, 2017, when he was assigned to investigate a shooting on the 6100 block of South Throop. On the morning of June 4, 2017, Antonya identified defendant as "the person who shot her brother" in a photograph. Otto identified the photograph in court and the State moved it into evidence. On June 12, 2017, Otto learned that defendant, whom he identified in court, had been arrested.

¶ 16 Detective Thomas Dineen testified that he was on duty on June 13, 2017. Michelle identified defendant, whom Dineen identified in court, as "the person that shot [her] cousin in front of [her] face" in a photo array. Dineen identified the photo array and a photo array advisory form that Michelle signed.

¶ 17 Detective Thomas Downes testified that he was on duty on June 13, 2017. Monay identified defendant, whom Downes identified in court, in a lineup and said, "That's the boy who shot my brother." Downes identified a photograph of the lineup and a lineup advisory form that Monay signed.

¶ 18 The parties stipulated that Dr. Latanja Watkins, an assistant Cook County Medical Examiner, performed an autopsy of Novajah's body. Watkins observed four gunshot wounds. The first gunshot entered Novajah's left rear shoulder and exited his upper right chest. The second gunshot entered Novajah's left outer forearm and exited just below the top of his shoulder. The

third gunshot entered Novajah's left hip and travelled into his left buttock, where Watkins recovered and inventoried a "yellow metal jacketed projectile." The fourth gunshot entered Novajah's right rear thigh and exited through the front of his thigh. None of the gunshot wounds displayed evidence of close-range firing. Watkins opined that Novajah died due to multiple gunshot wounds and the manner of death was homicide. The State moved into evidence Watkins's autopsy report, the bullet that she recovered from Novajah's body, and a series of photographs that depict his gunshot wounds.

¶ 19    The parties stipulated that officer Jazzy Pedregosa was on duty on July 15, 2017. At 9:22 p.m., he attempted to perform a field interview when he saw a group of men loitering in front of an abandoned building on the 6400 block of South Peoria Street. One of the men fled, and Pedregosa chased him. Pedregosa recovered and inventoried a FEG .380 semiautomatic firearm and a Ruger 9-millimeter semiautomatic blue steel firearm from the 6400 block of South Peoria. The State moved the FEG .380-caliber firearm into evidence.

¶ 20    The parties stipulated that Illinois State Police forensic scientist Gregory Hickey determined that the bullet recovered from Novajah's body and the three fired cartridge cases recovered from the scene were all fired from the FEG .380 semiautomatic firearm that Pedregosa recovered.

¶ 21                                          2. Defendant's Case

¶ 22    Defendant testified that he had been convicted of unlawful possession of a weapon by a felon and possession of a stolen motor vehicle in 2013.

¶ 23    Defendant lived on the 6100 block of South Throop. At approximately 11:45 a.m. on June 3, 2017, he was on that block with his friends Isaiah "Rico" Thomas and Devon Patterson. Thomas

stopped to talk to a young woman, and Antonya asked from a window who he was talking to. Antonya "started yelling and then she came down. Novajah ran out of the house and then she came behind him." Defendant had been introduced to Antonya via Facebook several days prior; his Facebook profile name was "Trevon Roberson."

¶ 24    Novajah and Antonya came across the street to where defendant and Thomas were standing and began arguing with Thomas. Patterson was approximately 10 feet away from the argument. Thomas apologized to Novajah and the two men fist-bumped. Monay and Michelle then "came out a little" and Monay trying to determine who had been rude to Antonya. Defendant told Monay to go back across the street and began arguing with her. Novajah, Antonya, Michelle, and "another male" started to "form around" Monay approximately five feet from defendant. Novajah grabbed Monay, moved her to the side, and started arguing with defendant. Novajah was approximately four feet from defendant but got closer as they argued. As Novajah approached, defendant saw him reach for his waistline and believed "he was about to pull a gun out," but did not actually see him draw a firearm. Defendant reached for his own revolver and heard three or four gunshots from behind him. Defendant believed that Patterson was the one firing because he had seen Patterson with a firearm earlier that day, but he did not actually see Patterson use a firearm. Defendant did not fire his revolver. When the gunshots stopped, defendant ran because he was scared. He did not realize that Novajah had been shot.

¶ 25                          3. Closing and Ruling

¶ 26    In closing, the State argued that Antonya, Michelle, and Monay all identified defendant as the person that discharged a firearm in their direction when they were standing together in a group. Defendant acknowledged that he was armed with a revolver but argued that the only cartridge

cases recovered from the scene were from the .380 semiautomatic, not a revolver; thus, defendant did not fire his revolver. Defendant conceded that, if he fired his revolver, "there would be no physical evidence left behind" because "[r]evolvers don't leave behind shell casings." In rebuttal, the State acknowledged that the bullet recovered from Novajah's body came from a .380 semiautomatic, not a revolver.

¶ 27 The court found defendant guilty of three counts of aggravated discharge of a firearm but acquitted him of the first-degree murder and attempt murder counts. The court reasoned that the evidence established that defendant fired his revolver in the direction of Antonya, Michelle, and Monay as they were standing with Novajah. Thus, the court found defendant guilty of all three counts of aggravated discharge of a firearm. The court acquitted defendant of the attempt murder counts because the State failed to prove that defendant shot at Antonya, Michelle, and Monay with intent to kill. In addition, the court acquitted defendant of the first-degree murder counts because the physical evidence only connected the .380 semiautomatic to Novajah's murder, and the State did not seek to hold defendant liable through an accountability theory.

¶ 28 B. Posttrial and Sentencing

¶ 29 Defendant filed a motion for new trial, which argued in relevant part that the State failed to prove him guilty of aggravated discharge of a firearm beyond a reasonable doubt. The court denied this motion and sentenced defendant to 15 years' imprisonment for each count of aggravated discharge of a firearm, to run concurrently. Defendant filed a motion to reconsider sentence, which argued that his sentence was excessive, the court improperly considered in aggravation matters that were implicit in the offense, and the sentence was not imposed for the purpose of restoring him to useful citizenship. The court denied this motion.

¶ 30     Defendant timely appealed.

¶ 31                                    II. ANALYSIS

¶ 32     On appeal, defendant challenges the sufficiency of the evidence and his three separate

convictions and sentences. Specifically, he contends that the State failed to prove beyond a

reasonable doubt that he discharged a firearm and that he did so in the direction of Antonya,

Michelle, or Monay Ringgold. He also argues that he should receive day-for-day good time credit

and that his three convictions and sentences violate the one-act, one-crime rule because they are

premised on the single physical act of discharging a firearm.

¶ 33                             A. Sufficiency of the Evidence

¶ 34     Defendant first challenges the sufficiency of the evidence supporting his convictions for

aggravated discharge of a firearm. He argues that the State did not prove beyond a reasonable

doubt that he discharged a firearm, or that he did so in the direction of Antonya, Michelle, or

Monay Ringgold.

¶ 35     "When reviewing the sufficiency of the evidence, the relevant question is whether, after

viewing all the evidence in the light most favorable to the State, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *People v. Brand*, 2021

IL 125945, ¶ 58 (not yet released for publication and subject to revision or withdrawal) (citing

*People v. Davison*, 233 Ill. 2d 30, 43 (2009)). We do not retry the defendant. *People v. Swenson*,

2020 IL 124688, ¶ 35 (not yet released for publication and subject to revision or withdrawal) (citing

*People v. Smith*, 185 Ill. 2d 532, 541 (1999)). Rather, the trier of fact determines the credibility of

the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and

draws reasonable inferences from the evidence. *Id.* ¶ 36 (citing *People v. Phelps*, 211 Ill. 2d 1, 7

(2004)). We will only reverse a conviction if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *Id.* ¶ 35 (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).

¶ 36   To prove each of the three counts of aggravated discharge of a firearm as charged here, the State had to establish that defendant knowingly discharged a firearm in the direction of Antonya, Michelle, and Monay Ringgold, respectively. See 720 ILCS 5/24-1.2(a)(2) (West 2016).

¶ 37   We find that the evidence sufficiently established that defendant discharged a firearm in the direction of Antonya, Michelle, and Monay Ringgold. There is no dispute that defendant was armed with a revolver on the 6100 block of South Throop on the morning of June 3, 2017, and that he brandished his revolver within a few feet of Novajah, Antonya, Michelle, and Monay. Antonya, Michelle, and Monay all testified that they saw defendant fire his revolver from 3 to 10 feet away. Antonya explicitly testified that defendant fired a revolver in the direction of her, Michelle, and Monay. Michelle testified similarly, stating that she, Novajah, Antonya, and Monay were standing "shoulder-by-shoulder" when defendant fired his revolver three times at them. Monay testified that defendant shot Novajah and that she, Antonya, and Michelle were standing right next to Novajah when this occurred, supporting an inference that defendant fired in the direction of all four Ringgolds simultaneously. All three women identified defendant to police shortly after the incident. Altogether, the eyewitness testimony established that Novajah, Antonya, Michelle, and Monay were standing close together in a group when defendant discharged a firearm at the group three times from close range. " '[T]he testimony of just one credible witness is sufficient for conviction.' " *Swenson*, 2020 IL 124688, ¶ 36 (quoting *City of Chicago v. Morris*, 47 Ill. 2d 226, 230 (1970)). In this case, three eyewitnesses identified defendant as having discharged a firearm

in their direction multiple times. Thus, the evidence was sufficient to prove that defendant discharged a firearm and that he did so in the direction of Antonya, Michelle, and Monay.

¶ 38    Defendant essentially makes two arguments in support his challenge to the sufficiency of the evidence. First, he contends that we should accept his testimony that he did not fire the revolver over the Ringgolds' testimony that he did. Specifically, defendant argues that the Ringgolds' testimony that defendant fired the revolver is not credible because they "gave significantly different accounts of where he supposedly shot the gun." The trial court necessarily accepted the Ringgolds' accounts as credible and rejected defendant's account as not credible because it found that defendant fired his revolver, just as the Ringgolds testified and contrary to what defendant claimed. The minor discrepancies in the Ringgolds' testimony that defendant notes do not overcome the great deference we give to the trial court's credibility determinations. See *id.* We see no basis to invert the trial court's credibility findings, which is what defendant asks us to do.

¶ 39    Second, defendant argues that the ballistics evidence establishes that he did not fire his revolver and that only a .380-caliber semiautomatic was fired during this incident. Physical evidence is not necessary to corroborate eyewitness accounts of a shooting (*People v. Corral*, 2019 IL App (1st) 171501, ¶ 91), which, in this case, established that defendant did fire his revolver. The fact that police did not locate revolver cartridge cases on scene does not negate the eyewitness testimony. Revolvers do not eject fired cartridge cases. *People v. Space*, 2018 IL App (1st) 150922, ¶ 28. Rather, fired cartridge cases must be manually removed from a revolver. *Id.* Thus, the lack of revolver cartridge cases on scene does not imply that defendant did not fire a revolver. Similarly, the lack of revolver bullets on scene does not mean that defendant did not discharge his revolver.

¶ 40   The fact that Antonya, Michelle, and Monay were not shot does not support reversal either. Poor marksmanship is not an affirmative defense to aggravated discharge of a firearm, and it was reasonable for the trial court to conclude that defendant fired in the direction of the three women but, for whatever reason, did not hit them. See *People v. Daheya*, 2013 IL App (1st) 122333, ¶ 78. In addition, defendant's convictions for aggravated discharge of a firearm in the direction of Antonya, Michelle, and Monay were not premised on the .380-caliber bullet recovered from Novajah's body. That bullet was probative of who shot Novajah, *i.e.*, the first-degree murder count, which is not at issue in this appeal. The ballistics evidence, therefore, does not undermine the State's proof of defendant's guilt.

¶ 41   The cases that defendant cites do not compel reversal of his convictions. See, e.g., *Daheya*, 2013 IL App (1st) 122333, ¶ 3 (evidence was sufficient to convict the defendant of aggravated discharge of a firearm even through the State did not introduce the firearm); *People v. Charleston*, 278 Ill. App. 3d 392, 398 (1996) (victim did not testify that the defendant discharged a firearm in her direction); *People v. Hartfield*, 266 Ill. App. 3d 607, 608-09 (1994) (eyewitness did not see the defendant discharge a firearm). Accordingly, we find that the State established defendant's guilt beyond a reasonable doubt.

¶ 42                                 B. Sentences

¶ 43   Defendant also challenges his sentences. Specifically, he contends that his three convictions and sentences for the single physical act of discharging a firearm violate the one-act, one-crime rule. He also argues that he should receive day-for-day good time credit due to a conflict in the Unified Code of Corrections that should be resolved in his favor.

¶ 44                         1. Forfeiture and Plain Error

¶ 45    Defendant acknowledges that he failed to preserve both issues for appeal because he did not raise them in the trial court. Thus, he has forfeited both issues. See *People v. Smith*, 2019 IL 123901, ¶ 14. Nevertheless, defendant argues that we should review these issues for plain error. Illinois Supreme Court Rule 615(a) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). " 'A defendant seeking plain-error review has the burden of persuasion to show the underlying forfeiture should be excused.' " *People v. Schoonover*, 2021 IL 124832, ¶ 26 (not yet released for publication and subject to revision or withdrawal) (quoting *People v. Johnson*, 238 Ill. 2d 478, 485 (2010)). The plain error doctrine applies when a clear or obvious error occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Clark*, 2016 IL 118845, ¶ 42. We review an alleged one-act, one-crime violation under the second prong of the plain error doctrine because it affects the integrity of the judicial process. *Smith*, 2019 IL 123901, ¶ 14. Similarly, a potential increase in a defendant's sentence by denying him day-for-day good time credit falls under the plain error doctrine. *People v. Russell*, 237 Ill. App. 3d 310, 314 (1992). We review claims of plain error *de novo* (*Johnson*, 238 Ill. 2d at 485), which means that we perform the same analysis that a trial court would perform (*People v. Miles*, 2017 IL App (1st) 132719, ¶ 19). The first step in plain error analysis is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 46                                     2. One-Act, One-Crime

¶ 47 Defendant argues that "there was no evidence presented at trial that [he] fired more than a single shot" and that the trial court improperly used this single shot to support three separate convictions for aggravated discharge of a firearm, one for each victim. He contends that, under section 24-1.2(a)(2), "the discharge of the firearm is the unit of prosecution, not the number of persons at which the firearm was discharged, [so] only one conviction for aggravated discharge of a firearm can stand." Defendant characterizes his convictions and sentences for three counts of aggravated discharge of a firearm as a violation of the one-act, one-crime rule.

¶ 48 The one-act, one-crime rule provides that a defendant may not be convicted of multiple crimes if they are based on precisely the same physical act. *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 24. An "act" is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. When a defendant is convicted of multiple offenses based on precisely the same physical act, convictions for the less serious offenses must be vacated. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). Whether a conviction should be vacated under the one-act, one-crime rule is a question of law that we review *de novo*. *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 49 Multiple convictions with concurrent sentences are proper when a defendant has committed multiple acts, "despite the interrelationship of those acts." *King*, 66 Ill. 2d at 566. Moreover, "when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *Id.* Thus, we must first determine whether defendant's conduct consists of one act or multiple acts. See *Coats*, 2018 IL 121926, ¶ 12.

¶ 50 Michelle's testimony established that defendant fired three shots:

"**The first time**, I heard the pop and realized that it was an actual, legit weapon. It was like a flicker or flash. So my first sudden move was to stand still. I was in shock. I was like (gesturing). And so I'm standing there as I hear other people screaming. And that **second shot**, I'm like, okay now, this is real. And I immediately almost like looked at myself outside my body. I'm standing there. That **second shot** snapped me to reality. Because now I'm like, okay. I see everyone running. Now I'm visually seeing him – I'm sorry to continuously point – I want to specify. I saw him in the back **shoot one more time** and commenced of running." (Emphasis added).

Michelle was clear that defendant was the only person she saw fire these gunshots. Each shot was a discharge of a firearm in the direction of a person, which section 24-1.2(a)(2) criminalizes. Thus, we find that defendant committed three criminal acts.

¶ 51 Having determined that defendant committed multiple acts, we next examine whether any offenses are lesser-included offenses. *See Coats*, 2018 IL 121926, ¶ 12. They are not. Defendant was found guilty of three counts of the exact same offense: aggravated discharge of a firearm in the direction of a person under section 24-1.2(a)(2). Under certain circumstances, multiple convictions for the same offense may be proper. *Id.* ¶ 24. In such cases, we must look to the legislative intent behind the statute and determine whether the evidence supports multiple violations. *Id.* To support multiple convictions, the charging instrument must indicate that the State intended to treat defendant's conduct as separate, multiple acts. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001).

¶ 52 The State charged defendant with three counts of aggravated discharge of a firearm in the direction of a person under section 24-1.2(a)(2), with each count premised on his discharge of a

firearm in the direction of Antonya, Michelle, and Monay Ringgold, respectively. Section 24-1.2(a)(2) provides that a defendant commits the offense when he knowingly or intentionally "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows to or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2(a)(2) (West 2016).

¶ 53   In the indictment, each count alleged that defendant "knowingly discharged a firearm in the direction of another person, to wit:" and named a separate victim: Antonya Ringgold, Michelle Ringgold, and Monay Ringgold. Thus, the indictment indicated that the State intended to treat defendant's conduct as three separate acts against three separate victims. See *Crespo*, 203 Ill. 2d at 345. As explained above, the evidence supported three separate convictions. Antonya, Michelle, and Monay all testified that defendant discharged his firearm in their direction, and Michelle specified that defendant fired three times. Based on this record, we conclude that defendant's convictions for three counts of the offense were proper. See *People v. Leach*, 2011 IL App (1st) 090339, ¶¶ 30-33 (three gunshots at three victims can support multiple convictions under section 24-1.2(a)(2)). Thus, because no one-act, one-crime violation occurred, there was no clear or obvious error. See *id.* ¶ 34.

¶ 54   Defendant does not dispute that section 24-1.2(a)(2) allows multiple convictions for multiple gunshots in the direction of multiple victims, but he insists that there was no evidence that he fired more than one shot. As explained above, that is incorrect. Michelle testified that defendant fired three times at her, Novajah, Antonya, and Monay.

¶ 55    Defendant's citation to *People v. Hartfield*, 2020 IL App (4th) 170787 is unhelpful for several reasons.[2] First, *Hartfield* involved a different subsection of the aggravated discharge of a firearm statute: section 24-1.2(a)(3), which criminalizes the discharge of a firearm in the direction of a peace officer. *Id.* ¶ 74; 720 ILCS 5/24-1.2(a)(3) (West 2016). Second, the defendant in *Hartfield* was found guilty of four counts of aggravated discharge of a firearm under section 24-1.2(a)(3) for firing two to five shots into a group of four police officers; each count was associated with one of the four officers. *Id.* at ¶ 19. So, in *Hartfield*, it was possible that there were more victims than discharges of a firearm, resulting in what the court characterized as "[s]urplus convictions," *i.e.*, convictions that were not actually based on the discharge of a firearm. *Id.* ¶ 71. By contrast, in this case, the evidence established that defendant fired three shots at three victims, so there is no risk of "surplus convictions." Third, and most importantly, even *Hartfield* recognized that the aggravated discharge of a firearm statute permits separate convictions for each shot fired because each shot is a "discharge" that the statute criminalizes. *Id.* ¶ 74. Our conclusion is consistent with that reasoning. Defendant fired three shots at three victims; therefore, three convictions for aggravated discharge of a firearm in the direction of a person are proper. Accordingly, we find no one-act, one-crime violation, and further plain error review is not warranted.

¶ 56                                3. Good Time Credit

¶ 57    Finally, defendant argues that he should receive day-for-day good time credit. Specifically, he contends that two clauses of the Unified Code of Corrections that govern sentence credit for

_____

[2] *Hartfield* is currently on appeal before the Illinois Supreme Court. *People v. Hartfield*, 163 N.E.3d 751 (2021) (table).

aggravated discharge of a firearm are in conflict, and that we should resolve that conflict in his favor by awarding day-for-day good time credit.

¶ 58    Section 3-6-3(a)(2)(iii) of the Unified Code of Corrections provides that a defendant who committed aggravated discharge of a firearm on or after June 19, 1998, "when the court has made and entered a finding, *** that the conduct leading to conviction for the enumerated offense resulted in great bodily harm to a victim, shall receive no more than 4.5 days of sentence credit for each month of his sentence of imprisonment." 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016). Section 3-6-3(a)(2)(iv) provides that a defendant who committed aggravated discharge of a firearm on or after June 23, 2005, "whether or not the conduct leading to conviction for the offense resulted in great bodily harm to the victim, shall receive no more than 4.5 days of sentence credit for each month of his or her imprisonment." 730 ILCS 5/3-6-3(a)(2)(iv) (West 2016). If clause (iii) applies to defendant, then he should receive day-for-day credit (the default position) unless the trial court specifically found that his conduct resulted in great bodily harm, which it did not. See *People v. Darius Williams*, 2017 IL App (1st) 150795, ¶ 52. However, if clause (iv) applies, then defendant cannot receive day-for-day good time credit regardless of whether the trial court found great bodily harm, and he must serve 85% of his sentence. See *id.*

¶ 59    We find that clause (iv) applies. There is no dispute that defendant committed aggravated discharge of a firearm after June 23, 2005. He committed this offense on June 3, 2017. Thus, he cannot receive day-for-day good time credit and he must serve 85% of his 15-year sentence.

¶ 60    Defendant argues that clauses (iii) and (iv) conflict with each other, and that, under the rule of lenity, we should resolve this conflict in favor of him receiving day-for-day credit. We rejected this exact argument in *Darius Williams* and in *People v. James Williams*, 2015 IL App (1st)

130097. In *Darius Williams*, we explained that clauses (iii) and (iv) do not conflict. *Darius Williams*, 2017 IL App (1st) 150795. ¶ 53. Rather, "the legislature intended, by including these two effective dates, that the penalties for aggravated discharge of a firearm should change depending on when they were committed." *Id.* ¶ 54. "[T]he penalty became more severe starting on June 23, 2005, and there would be no day-for-day credit regardless of whether the conduct resulted in great bodily harm." *Id.* Defendant cites no authority that justifies departing from the holding of *Williams*. Accordingly, we find that he is not entitled to day-for-day credit and must serve 85% of his sentence.

¶ 61                                III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm defendant's convictions and sentences.

¶ 63    Affirmed.